# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 4, 2003 Session

## STATE OF TENNESSEE v. ANDREW THOMAS AND ANTHONY BOND

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-03095   Joseph B. Dailey, Judge**

---

**No. W2001-02701-CCA-R3-DD  - Filed February 27, 2004**

---

Defendants Andrew Thomas and Anthony Bond appeal as of right their convictions for the first degree felony murder of Loomis Fargo employee, James Day, during the perpetration of a robbery. Following a separate sentencing hearing, the jury found, as to each defendant, that the proof supported one aggravating circumstance beyond a reasonable doubt, that is, the defendant had been previously convicted of one or more violent felonies. See Tenn. Code Ann. § 39-13-204(i)(2). With respect to Defendant Thomas, the jury further determined that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt, and sentenced Defendant Thomas to death. As to Defendant Bond, the jury found that the aggravating circumstance did not outweigh the mitigating circumstances and imposed a sentence of life without the possibility of parole. The trial court approved the sentencing verdicts. In this appeal as of right, Defendant Thomas raises the following issues for this Court's review: (1) the sufficiency of the evidence; (2) whether the trial court erred by denying various pre-trial motions; (3) whether the trial court erred by failing to continue the case after the events of September 11, 2001; (4) whether the trial court erred by excusing prospective juror Pannell for cause; (5) whether the trial court erred by admitting photographs of the victim; (6) whether the trial court erred by admitting items from Defendant's prior federal trial arising out of the robbery; (7) whether the trial court erred in restricting the Defendant's impeachment of Angela Jackson; (8) whether the trial court erred in failing to voir dire a prospective witness regarding her relationship with defense witness Russell Carpenter; (9) whether the trial court erred in sustaining an objection to the testimony of John Hibbler; (10) whether the trial court erred in permitting testimony regarding fingerprints despite stipulation; (11) whether the trial court erred in the admission of expert testimony; (12) whether the trial court erred by failing to charge lesser-included offenses of felony murder; (13) whether the trial court erred by failing to charge the jury with an accomplice instruction; (14) whether it was plain error for the State to refer to Thomas and Bond as "Greed and Evil" in opening statement and closing argument; (15) whether the trial court erred in permitting the State to argue that the jury had a job to find the Defendants guilty; (16) whether the trial court erred by not instructing on specific mitigating factors; (17) whether the trial court erred by permitting the State to cross-examine the Defendant's mother regarding disciplinary actions taken against the Defendant while in prison; (18) whether the verdict

of the jury was against the weight of the evidence; (19) whether the indictment failed to charge a capital offense; (20) whether the death penalty violates international treaties ratified by the United States; (21) whether the Tennessee death penalty scheme is unconstitutional; and (22) whether the sentence is proportionate. Defendant Bond raises the following issues: (1) whether it was error for the trial judge to fail to recuse himself for failure to follow Local Rule 4.01; (2) whether the trial court erred by overruling Bond's objection to the testimony of Dr. Smith; (3) whether the trial court erred by declaring Dr. Smith an expert in firearms identification; (4) whether the trial court erred by permitting the prosecution to engage in improper argument; (5) whether the trial court erred by permitting the prosecution to elicit testimony from Angela Jackson regarding her attendance at trial; and (6) whether the trial court erred by failing to instruct the jury as to lesser-included offenses of felony murder. After review of the record and the applicable law, we find no errors of law requiring reversal as to Defendant Thomas. Accordingly, we affirm the jury's verdict finding Defendant Thomas guilty of first degree murder. Additionally, we affirm the jury's imposition of the sentence of death as to Defendant Thomas. However, with respect to Defendant Bond, we are unable to conclude that the failure of the trial court to instruct the jury as to the lesser-included offenses of felony murder was harmless beyond a reasonable doubt. Accordingly, we vacate Defendant Bond's conviction for felony murder and accompanying sentence of life without the possibility of parole. With respect to Defendant Bond, this matter is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as to Defendant Thomas; Reversed and Remanded as to Defendant Bond**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JOE G. RILEY, J., filed an opinion concurring in part and dissenting in part.

Lorna S. McClusky and Howard Manis, Memphis, Tennessee (at trial and on appeal), for the appellant, Anthony Bond.
Michael E. Scholl and Jeffery Glatstein, Memphis, Tennessee (at trial), for the appellant, Andrew Thomas.
Robert Brooks, Memphis, Tennessee (on appeal), for the appellant, Andrew Thomas.

Paul G. Summers, Attorney General and Reporter; Alice B. Lustre, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Guilt Phase Evidence

On Monday, April 21, 1997, thirty-nine-year-old James Day, a guard with Loomis Fargo, prepared to go to work. He instructed his wife, Faye, to go to Sears that day and buy him a pair of work boots because the boots were on sale. He then stated, "Now, you be a good little wife today," and left for work.

Betty Gay, a cashier at the Walgreens store located on Summer Avenue in Shelby County, went to the employee break room "[a] little after 12:00 [noon]" to eat lunch. Upon returning from lunch, Ms. Gay recognized James Day "standing at the door waiting for somebody to open it up." Ms. Gay clocked back in to work at 12:37 p.m., "got [her] drawer," and proceeded back to the front of the store. Meanwhile, James Day visited the office, received the store's deposits, and returned to the front of the store. Because it was a Monday, the deposit included receipts from Saturday night and Sunday. The receipts for these two days, not including checks and foodstamps, totaled $18,843.01 in cash. When Mr. Day was leaving the store, Ms. Gay told him "Have a good day." Shortly thereafter, Ms. Gay heard a gunshot. She "hollered and told them to call 911." She then looked out of the store and saw James Day "lying on the concrete, and this [black] man was running, and he had a gun in his hand and a money bag in the other hand."

Charles Young, the assistant manager of the Walgreens store, ran outside the store and observed James Day "lying almost face down. There was a puddle of blood on the back coming out . . . behind him . . . ." Mr. Day was conscious and asked Mr. Young to "Call my wife." Mr. Young instructed a cashier to retrieve a blanket from inside the store for Mr. Day. Mr. Day remained cognizant and continued to talk to Mr. Young until the ambulance arrived. Mr. Day survived his devasting injury until October 2, 1999, a period of about two and one-half years.

Richard Fisher, the owner of Music Town, a nearby business, was returning from his lunch hour when he heard the gunshot. Mr. Fisher looked in the direction of the gunshot and saw a white car "speed" in front of the Walgreens around the Loomis Fargo truck. The car came within approximately four feet of Mr. Fisher, enabling him to get a look at the people inside the vehicle. Mr. Fisher later related that the car contained two black males; he subsequently identified the passenger as Defendant Thomas.

Christopher Sains, a commercial driver for the Coca-Cola Company, made his delivery to the Summer Avenue Walgreens shortly before noon. While unloading his delivery at the back dock area, Mr. Sains noticed that a "fast-moving vehicle was coming from around inside of the Walgreens lot through the underpass to the back . . . area where I was. A four-door white car . . . about to lose control. And I saw two individuals in the car." Mr. Sains then observed two African-American males get out of the white car and get into a small red car. The men headed north in the red car. The men left the white car unattended.

3

Gary Craig lived on Novarese Street directly behind the Summer Avenue Walgreens store. Mr. Craig heard the screeching of brakes outside his residence and went outside. He observed a white car "pulling up this way, a red car pulled in this way." A "man got out of the white car, ran over here, laid [back] in the front seat of the red car. They went backwards through the intersection of Tutwiler and Novarese and then went up Tutwiler going that way." Mr. Craig identified the white car as a Pontiac Bonneville and the red car as a Toyota MR2.

The white Pontiac was ultimately towed for processing. Fingerprints were "lifted" from the vehicle. One of the fingerprints found on the Pontiac matched a fingerprint belonging to Defendant Anthony Bond. The car was identified as belonging to Jack Wilson, a resident of the Wesley Highland Towers, a retirement home, at 400 South Highland. The vehicle had been reported stolen during the early morning hours of April 21, 1997.

Angela Jackson was Defendant Thomas' girlfriend. She testified on behalf of the State at the trial. In 1997, Ms. Jackson resided with her two children at the Pendleton Pines Apartments. Defendant Thomas would sometimes spend the night there, and he kept some personal belongings at Jackson's apartment. Although Defendant Thomas did not own a car, Ms. Jackson drove a red Suzuki Swift until it was repossessed. Ms. Jackson recalled Defendant Thomas' desire for a car of his own. Although Thomas was unemployed, he made remarks about buying a car. In fact, Defendant Thomas often commented to Ms. Jackson that he was going "to get that money." Such comments were made while the couple was driving behind an armored truck.

On April 21, 1997, Ms. Jackson was at her residence because she was sick. Defendant Thomas was also at her apartment. Thomas left the apartment between 8:00 a.m. and 8:30 a.m, telling Ms. Jackson that he was going to pick up Anthony Bond and that he would be right back. Defendant Thomas left driving Jackson's red Suzuki. Defendant Thomas, accompanied by Defendant Bond, returned to the apartment around noon. The two men were out of breath, and they appeared to be excited. When they entered the apartment, Defendant Bond unzipped his jacket and some white envelopes fell to the floor. Defendant Thomas began opening the envelopes and removing money. Defendant Thomas instructed Defendant Bond to "get rid of the gun." Jackson then noticed a "silver looking" gun on the floor. Defendant Thomas instructed Ms. Jackson "to ball the envelopes up." Jackson noticed that, in addition to the cash, the envelopes contained checks and food stamps. Thomas and Bond split the money. Defendant Bond took the gun with him when he left the apartment. After Bond left, Thomas gave Jackson his share of the money.

Ms. Jackson testified that she and Defendant Thomas then went to look for a car for Defendant Thomas. The couple went to Auto Additions on Elvis Presley Boulevard. Defendant Thomas test drove a hot pink box Chevy. After Defendant Thomas drove it, the couple purchased the car for $3,975.00 in cash. Because Thomas did not have his license, Angela Jackson's name was placed on the bill of sale.

After purchasing the new car and returning to Jackson's apartment, Defendant Thomas advised Jackson that they needed to go to a hotel. The couple, along with Jackson's children, went

4

to a hotel on State Line Road. On the news on television that evening, Ms. Jackson watched a report that a guard on an armored truck had been shot and was struggling for his life. Defendant Thomas remarked that the newscaster was "lying; that he did not struggle for his life; he grabbed the nigger by the throat and shot him." The next morning, Ms. Jackson returned to her apartment with her children.

After leaving Angela Jackson's apartment, Defendant Bond, accompanied by Keith "KiKi" Echols, went to the residence of Treveous "TreeTree" Garrett sometime after lunch. Bond's girlfriend, Tanya Monger, testified that she noticed that Bond was in a good mood, and he showed Monger some money. The group went to the Southland Mall. At the mall, Defendant Bond handed "TreeTree" and Monger some money. Defendant Bond explained that the money was "drug money" and he did not want to get robbed. He then made numerous purchases, including shoes for himself and "KiKi," "shorts sets," and a necklace. The necklace cost approximately $1,100.00. The group then left the mall and drove down Elvis Presley Boulevard. Defendant Bond saw a white box Chevy at McClain Motors and Bond instructed "KiKi" to pull over. Bond purchased the car with the money he had given to Monger and "TreeTree," but asked Monger to put the car in her name. The vehicle cost $4,800.00. Bond, Monger, "TreeTree," and "KiKi" then proceeded to Bond's mother's house so Bond could get more money.

After obtaining more money from a "pillow" at his mother's house, Defendant Bond and his companions proceeded to Raleigh Mall. Defendant Bond bought Monger a pair of shoes. The foursome left the mall and got a room at the Fairfield Inn on Sycamore View. Defendant Bond and "KiKi" left the women at the room for about an hour. When they returned, Bond took "KiKi" and "TreeTree" to the Summer Motel.

The next morning, Defendant Bond had a dentist appointment for the purpose of "get[ting] some golds," that is, four gold teeth. Bond later asked Monger if she would also like some "golds" that spelled his name. Bond and Monger spent the night of the 22nd at the Summer Motel.

On April 22, Angela Jackson opened a savings account at First American National Bank. The account balance as of April 22, 1997, was $2,401.48. By May 30, 1997, the account balance was 58 cents. No further deposits were made. On April 24, 1997, David Little, the owner of North Watkins Pawn and Jewelers, sold a Mossberg twelve-gauge shotgun to Angela Lavette Jackson. Defendant Thomas had instructed Jackson to purchase the shotgun because they needed it for protection. Defendant Thomas purchased wedding rings for himself and Ms. Jackson. He also purchased a gold necklace for himself. The couple married on May 7, 1997. Two months later the couple separated and Ms. Jackson filed for divorce. During their separation, Defendant Thomas advised Ms. Jackson not to go the police about the robbery.

Sometime during the following summer, Tanya Monger and Defendant Bond were watching an episode of "Cops," when Bond remarked that he had robbed an armored truck. He later recanted, stating that he was just joking.

From the video surveillance tape recorded by Walgreens, the Memphis Police Department was able to produce several still shots of the shooting of Mr. Day. The video tape revealed that the gunman approached Mr. Day and extended his arm pointing directly toward the back of Mr. Day. The tape also provided still photographs showing Mr. Day falling to the ground after being shot, and the gunman taking something from Mr. Day and then running away.

On November 5, 1997, Defendant Bond provided a statement to law enforcement officers in which he admitted to participating in the April 21, 1997, robbery of the Loomis Fargo armored truck at the Walgreens store at 4522 Summer Avenue. Defendant Bond told the officers that the robbery had been planned "the day before." Defendant Bond stated that the Loomis guard was shot in the head with a short-barrel chrome revolver. He further stated that he was not the shooter, rather he was the driver of the "getaway car – a white Pontiac Bonneville four-door." Defendant Bond also admitted to receiving approximately half of the stolen money.

Tony Arvin, an assistant United States Attorney, testified that Anthony Bond entered a guilty plea on November 4, 1998, to federal charges arising from the robbery of James Day. During the guilty plea, Defendant Bond admitted that a firearm was discharged during the course of the robbery and that Mr. Day had been seriously wounded.

Also in November 1998, Mr. Day (the victim) testified during federal proceedings arising from the robbery. A transcript of Mr. Day's testimony was admitted at trial. Mr. Day had testified that he was employed as a guard by Loomis Fargo in April 1997. He stated that he wore a dark blue uniform, a gun belt and a bullet-proof vest. Mr. Day also carried a gun. He recalled that, on April 21, 1997, the Walgreens store at 4522 Summer was on his route. He further recalled arriving at the Walgreens store at approximately 12:30 p.m. Mr. Day went into the store, proceeded to the cash office, retrieved the deposit from the store manager, and left. Upon exiting the store, Mr. Day looked both ways before proceeding out of the store. When he went out the door, "[his] legs felt weak, so some way I feel I had been shot, so I started to go on and try to make it to the truck, but then I thought better because it was an armored truck. I didn't want to fall on no truck, so I just went down right there." Mr. Day was transported to the hospital where he learned he had been shot in the back of his head. He never heard the gunshot nor did he see the gunman. As a result of the gunshot, Mr. Day lost the use of his legs and underwent numerous surgeries. He was never again able to work.

At trial, Faye Day, the victim's widow, explained that her husband James had been a guard for Loomis Fargo Company. Prior to April 21, 1997, James Day had been in excellent physical condition with the exception of a minor sinus problem. Mrs. Day recalled that, on the day of the shooting, she completed her errands and returned home at approximately 1:00 p.m. At home, she received a telephone call from the emergency room at The Med advising that her husband had been shot. A few hours after her arrival at the trauma unit, Mrs. Day was told that her husband would have to have surgery because fluid had built up. After the surgery, James Day was unable to move his lower extremities. Mr. Day remained in the Med for thirty-eight days. During his stay at the hospital, his "lungs kept collapsing. He had numerous surgeries. He had pneumonia. They treated him medically."

6

Upon being discharged from The Med, James Day was transferred to Health South, a rehabilitative hospital, by ambulance. According to Mrs. Day, her husband was unable at this time to "do anything for himself. He couldn't walk. He couldn't bathe himself. . . . Physically, James was like a baby." Mr. Day was unable to use the bathroom; he was forced to wear a diaper. He remained at Health South for thirty days, during which time he underwent therapy. The therapy was not successful. Mrs. Day had to "cath [her] husband" and use suppositories and enemas during this time because of her husband's bladder and bowel problems.

Mr. and Mrs. Day then moved to Studio Plus Apartments in Germantown, because their home was not designed to accommodate Mr. Day's physical disabilities. Meanwhile, their home was being renovated to be handicap-accessible. After they returned to their home, Mr. Day's world became reduced to one room in his home. That room was his living room, bedroom, bathroom, and kitchen. Stripped of his role as husband and father, he became depressed.

Mr. Day was under the supervision of four different doctors, with whom he met at least once a month. In late September 1999, Dr. Shelton, a urologist, inserted a "leave-in Foley," a bag to collect urine, in an attempt to alleviate Mr. Day being wet. Later that evening, Mr. Day began "passing blood." However, according to Mrs. Day, it was "normal routine to pass a little blood" with a "Foley." This had occurred before and the doctor had advised Mrs. Day to "continue to give [Mr. Day] fluid because the more fluids you have the clearer your urine gets." Mrs. Day was "concerned because it seemed to be a little bit more [blood] than normal." She immediately tried to contact Dr. Shelton. Dr. Shelton was no longer on duty, but another physician advised her to "continue to give him plenty of fluids, and it should clear up." However, the blood did not clear up and Mrs. Day made repeated telephone calls to the doctors. Under the advice of the doctors, Mrs. Day continued to feed Mr. Day fluids, and the bleeding stopped at around 5:00 a.m. However, Mrs. Day noticed that her husband was weaker than usual.

Dr. Shelton later contacted Mrs. Day and instructed her to bring Mr. Day to the emergency room. She was unable to get him into her vehicle, so she called the ambulance service for assistance. Mr. Day was paler than usual and his blood pressure was low. Mrs. Day followed the ambulance to Methodist Central. At the emergency room, she was informed that the doctors would have to perform surgery because they found something abnormal in Mr. Day's stomach. He was then placed on full life support. The surgery revealed that his "bladder had burst, and sepsis had set in, and the first thing that went was his kidneys." Faye Day was informed that "it would just be a matter of time" before her husband died. His lungs started collapsing, and the doctors "just kept bringing him back." Mr. Day continued to weaken, and he finally died on October 2, 1999.

On October 4, 1999, Dr. O.C. Smith, the medical examiner for Shelby County, performed an autopsy on James Day. Dr. Smith testified that the ruling on this particular autopsy took longer than usual because of the "circumstances in which a person received a gunshot wound to the back of the head about two and a half years prior to their dying as a result of an infection from a ruptured bladder." In his final ruling, Dr. Smith opined that "Mr. Day did, indeed, die as a result of the

7

infection from the ruptured bladder which could be directly related back to his gunshot wound." Accordingly, Dr. Smith determined that the "manner of death" was a "homicide."

Dr. Smith's examination revealed that Mr. Day did not have any "old or blistered or healing" bedsores and the lack of the presence of contractures in the muscles, joints and tendons indicated that "he would have [had] some sort of physical activity applied to his limbs." Dr. Smith located the scar resulting from the surgery incident to the gunshot wound. In relation to the scar on the back of Mr. Day's scalp, Dr. Smith, during an internal examination, found a "four-by-four-centimeter defect in the occipital bone or the bone that's right in the back of the head . . . ; that area showed operative intervention." An examination of the victim's brain revealed that the cerebellum, a portion of the brain, had suffered damage in which tissue had been destroyed.

The examination further revealed that Mr. Day had suffered from heart disease in that at least one of his coronary arteries had about ninety-percent blockage and the others had between forty and ten percent blockage. Dr. Smith opined that, due to the extent of the blockage, the condition could have existed prior to the gunshot wound. The color of Mr. Day's liver indicated the presence of a fatty deposition. Also, the inflammation of the lining of the cavity of the abdomen was indicative of a condition known as peritonitis. Of significance, however, was the finding of a four-centimeter tear in the victim's bladder that had been repaired at surgery. According to Dr. Smith, this finding was significant because,

in reviewing both the autopsy findings and the medical history, it became clear that Mr. Day had suffered the effect of an overwhelming infection of the body known as sepsis where bacteria will get into the bloodstream and [be] distributed . . . essentially throughout the body. When that condition occurs, one tries to the find the source of that infection, and Mr. Day's bladder was markedly distended. . . . It also showed the tear in the wall that had both bleeding and the inflammatory changes consistent with the peritonitis. Therefore, it's logical to conclude that the rupture of the bladder, . . . bec[a]me the source of an infection throughout the body. . . . It can be a very difficult process to treat and can certainly result in . . . death.

Dr. Smith continued,

[B]ecause of Mr. Day's underlying condition of having a neurogenic bladder, he [was] very susceptible to having a large amount of bacteria in his bladder. . . .
. . .
        A neurogenic bladder is a condition in which a person has received an injury of the spinal cord so that the nerves that control the ability of the bladder to empty itself, either by relaxing certain muscles and causing other muscles to contract - -that this process is no longer a coordinated fashion. A person may have spasms or a person may have a very flaccid bladder, as a result of which, the person no longer has bladder control.
. . .

8

[Mr. Day] carried a diagnosis of neurogenic bladder and loss of bowel control from the time that he suffered his collapse following the gunshot wound to the head.

In explaining the spinal-cord injury, Dr. Smith explained:

> Basically after Mr. Day received the gunshot wound to the head, there was an accumulation of blood in the back of the head which caused damage to the cerebellum and pressed on his  - - the central portion of his brain where the brain exits the skull down the spinal cord.  As a result of that, he wasn't able to control his blood pressure.
>
> . . .
>
> But when a person suffers a hypotensive episode, you don't really know the effects of that loss of blood pressure until they've been resuscitated and the blood pressure comes back to normal.  And at that point in time, you may find out that there had been, indeed, damage to portions of the central nervous system, such of which is not uncommon for the spinal cord to have selected areas of damage after the loss of blood pressure, and the person will then suffer the effects of that spinal-cord damage; in this case, loss of bladder and bowel control.

Dr. Smith commented that it was insignificant that the gunshot wound did not penetrate the dura, the membrane that surrounds the brain, because it did push tissue forward enough to cause damage to the cerebellum and blood vessels.  Dr. Smith concluded that, if surgery had not been performed on Mr. Day on April 21, 1997, the day he was shot, Mr. Day would have died shortly thereafter.

After closing arguments, the jury retired to deliberate on the question of guilt or innocence and returned with a verdict finding both Defendants "guilty of unlawfully and with the intent to commit a robbery killing James Day during an attempt to perpetrate robbery as charged in the indictment."[1]

### Penalty Phase Evidence

The State presented the testimony of Joe Warren, a Shelby County criminal court clerk, to introduce the Defendants' prior convictions.  The clerk's files indicated that, on December 22, 1999, Anthony Bond was convicted in indictment 98-04518 of aggravated robbery, in indictment 98-04520 of aggravated robbery, in indictment 98-04524 of aggravated robbery, and in indictment 98-04526 of aggravated robbery.  The files also reflect a conviction entered June 7, 1995, for Defendant Bond arising from indictment 95-03886 for aggravated robbery.  Mr. Warren explained that "R and I" numbers, "record and identification numbers," are assigned to persons as they are arrested.  That number remains forever attached to that individual.  Defendant Bond's "R & I" number is 219189.  The "R & I" number in cases 98-04518 through 98-04526 and 95-03886 belongs to Defendant Bond.  The indictments from these offenses reveal that each conviction involved a separate victim and every offense involved the use of a handgun.

---

[1]Neither of the Defendants was charged with a robbery offense in this case.

9

The clerk's files further indicate that, on September 6, 1994, Defendant Thomas was convicted in indictment 93-05155 of aggravated robbery, in indictment 93-05156 of aggravated robbery, in indictment 93-05157 of aggravated robbery, in indictment 93-05158 of aggravated robbery, in indictment 93-05159 of aggravated robbery, in indictment 93-05160 of robbery, in indictment 93-05161 of aggravated robbery, and in indictment 93-05162 of aggravated robbery. The files further reflect a conviction on January 31, 1994, in indictment 93-09267 of aggravated robbery. The indictments from these offenses, with the exception of his conviction for simple robbery, reveal that each conviction involved the use of a handgun and involved separate victims.

The victim's widow, Faye Day, testified that, prior to the shooting on April 21, 1997, her husband worked two jobs to support their family. Mrs. Day was unable to work due to a life-threatening condition, thrombophlebitis. Mrs. Day's sole sources of income for herself and the couple's sixteen-year-old son, Cedric, are her disability benefits and the social security benefits that their son receives as a result of Mr. Day's death. Mrs. Day added that Cedric works at a fast-food restaurant for additional income.

Mrs. Day expounded upon her relationship with her husband:

> Well, my husband was my everything. He was my husband, he was my best friend, he was my lover, he was my confidant. When he got shot . . . it changed. He was not the same person. Our whole household changed. . . . I didn't have a lover. . . . I had to walk around on cotton because the least little noise would just turn him into a frenzy. So I didn't have that closeness – that hugging relationship. I didn't have that person in my life at all for those thirty months that he survived[.]

Regarding the victim's son, Cedric, Mrs. Day stated that Cedric was just twelve years old when his father was shot. The two used to ride motorcycles together and go out to breakfast together. There were no more father-son days. Presently, Cedric has much "anger" over his father's death.

In mitigation, Defendant Bond called Memphis Police Officer Chad Golden. Officer Golden read Defendant Bond's confession in which he admitted participation as the driver in the robbery of the Loomis Fargo guard outside of the Walgreens store on April 21, 1997. In the statement, Defendant Bond implicated Defendant Thomas as the shooter. Additionally, Defendant Bond discussed the planning of the robbery. Specifically, Bond stated that the robbery of an armored truck was Defendant Thomas' idea. He further admitted that he "got the [white] car from Poplar Plaza." Defendant Bond described the events of April 21:

> Monday, [Defendant Thomas] came to pick me up . . . in a little red car that belonged to his girlfriend, Angie.
> Then I got the stolen car from Jackson and Tillman and drove it to Walgreens.
> We both got in the stolen car, and we left the red car around the corner from Walgreens.

Then a[n] armored truck pulled up in front of Walgreens. [Defendant Thomas] got out and shot him – the guard. [Defendant Thomas] got the money and got back in the car, and we drove around the corner and switched cars.

We drove to his girlfriend's house . . . . We went in the house and split the money up. I called a ride and left.

Bond denied knowing of Thomas' intent to shoot the guard.

Assistant United States Attorney Tony Arvin testified that Defendant Bond entered a guilty plea in 1998 to the robbery of James Day. Bond cooperated with federal authorities and testified against Defendant Thomas in his federal trial. At Defendant Bond's sentencing hearing in federal court, Defendant Bond was provided the opportunity to address the victim and his wife. Defendant Bond apologized to the victim, James Day, and accepted responsibility for his actions.

Judy Sandlin, Defendant Bond's fifth grade teacher, recalled that Defendant Bond was "a pleasant young man and basically obedient." She stated that she could not remember him being disrespectful or being a problem.

Tommie Bond, Defendant Bond's mother, stated that she has always worked, even when her son was in elementary school. This meant that her parents would take him to and from school. She testified that Defendant Bond was born in 1978; nine months later she bore a daughter. The two children are close and Mrs. Bond is close to her children. She reflected that Defendant Bond was always obedient, until he was about seventeen or eighteen years old. At age eighteen, Defendant Bond "got in trouble" and "got locked up." He was sent to prison in Tiptonville. While he was imprisoned, Mrs. Bond visited her son every visiting day. She also admitted that her son failed to finish high school. While in prison, Defendant Bond did earn his GED. Mrs. Bond testified that her son now realizes that he is in "serious trouble." She stated that "he don't want no part of this. This is not a life for him."

Shareda Puryear, Defendant Bond's sister, testified that she and her brother had different fathers. Until she was ten, her father lived with them, and then "his daddy" lived with them. She stated that her brother was a normal kid, but until the seventh grade, he "didn't talk very much, and [others thought] he was like geeky or something." Eventually, Defendant Bond made a complete "turnaround. He went from being quiet . . . to just like wild. . . ." On one occasion, Ms. Puryear saw her brother with "some white stuff. He was putting in his nose." Defendant Bond told her, "You know what this is, girl. Get away from me." Ms. Puryear stated that Defendant Bond was never close to his own father, but they did have a father-son relationship. She stated that, even though her brother was in prison, she still maintained a relationship with him.

For his mitigation proof, Defendant Thomas recalled Joe Warren. Mr. Warren explained that another Andrew Thomas, with a birthdate of 1949, also had multiple criminal convictions.

11

Defendant Thomas' brother, Andre Barber, testified that his biological father is Andrew Lee Thomas, Sr. He further explained that William Barber is his step-father. Prior to his brother being incarcerated, Andre shared a good relationship with Defendant Thomas. He stated that he loves his brother, and that Defendant Thomas was "all I got." He added that he did not know the whereabouts of his father. The two brothers maintain contact and talk about their mother's health and Andre's school. Andre averred that Defendant Thomas was the only man he had to look up to in his life. Furthermore, Defendant Thomas advises him not to do wrong.

Luella Barber, Defendant Thomas' mother, stated that Defendant Thomas was born in 1973. She testified that, when Defendant Thomas was born, his father was only around for about a year. For about twelve years, Mrs. Barber and Defendant Thomas lived with her mother-in-law. Defendant Thomas' father was in and out of jail, but he eventually came back. The relationship did not work between the two adults and they ended up separating due to his abusive behavior. During this time period, Mrs. Barber became pregnant with her second child, Andre. While pregnant, Mrs. Barber was physically abused by her husband and Defendant Thomas witnessed the abuse. Defendant Thomas' father also abused drugs. Shortly after her separation, Mrs. Barber met her second husband, William Barber. Thomas, however, remained upset that his real father was not around.

Mrs. Barber obtained a job with the United States Postal Service and things looked good for a while. Then, she discovered that William Barber was involved in drugs. Mrs. Barber lost her job. She was forced to apply for public assistance, including food stamps. Mr. Barber began physically abusing her. Mr. Barber began getting arrested and Defendant Thomas was forced to assume the role of the man of the house.

Mrs. Barber admitted that Defendant Thomas started getting in trouble when he was fourteen years old. He was first arrested for stealing and then he stopped going to school. Thomas' mother acknowledged that Thomas had a son, Devonte, and that Thomas loved his son. She also stated that Defendant Thomas had earned his GED the last time he was in jail. Additionally, he earned a certificate for "residential plumber helper" while incarcerated at Tiptonville. Mrs. Barber stated that Defendant Thomas still played a big part in their daily lives even though he was incarcerated.

On cross-examination, Mrs. Barber verified that Defendant Thomas was last released from prison on February 24, 1997. The robbery and shooting of James Day occurred two months later on April 21, 1997.

Alacia Bolden, the mother of Defendant Thomas' son, testified that their son, Devonte, is eight years old and is an honor roll student at Grahamwood Elementary. Devonte continues to maintain a close relationship with his father. Ms. Bolden averred that she believed that every child needs both a mother and father even if the father is in prison. She added that Defendant Thomas was a good father to their son.

Defendant Thomas' cousin, Stephanie Williams, testified that she and her cousin maintained a close relationship. She stated that she loved Defendant Thomas and she does not "want to see him die." Tamara Weeks, another cousin of Thomas, testified that she and her cousin were only six months apart in age and have always maintained a close relationship. Ms. Weeks stated that her son is three months older that Defendant Thomas' son. She further acknowledged that her cousin was presently serving a life sentence in federal prison and he would never be coming home again. Notwithstanding, Ms. Weeks maintained that Defendant Thomas remained an important male role model in his son's life.

At the close of the proof, the jury was instructed on the following statutory aggravating circumstance:

> The defendants, Anthony M. Bond and Andrew L. Thomas, were previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crimes of Aggravated Robbery and Robbery, which are felonies involving the use of violence to the person.

See generally Tenn. Code Ann. § 39-13-204(i)(2). As to Defendant Bond, the jury was also instructed that it should consider as mitigating circumstances:

> (1) Any testimony that he was a loving child.
> (2) Any testimony he was a loving sibling.
> (3) Any testimony regarding loving relationships with grandparents and family members.
> (4) Any testimony showing that he was respectful to adults in childhood.
> (5) Any testimony showing no known significant issues until age 15.
> (6) Any testimony showing lack of bonding with positive male figures.
> (7) Any testimony showing immaturity.
> (8) Any testimony showing that he is easily influenced and led by older peers.
> (9) Any testimony showing no criminal conviction committed alone.
> (10) Any testimony of a history of substance abuse.
> (11) Any testimony showing a lack of a formal education.
> (12) Any testimony showing he obtained a GED while incarcerated.
> (13) Any testimony he cooperated with authorities.
> (14) Any testimony regarding apology expressed in Federal Court.
> (15) Any testimony regarding proof that shows that he has family members that will provide him with love and support while in prison.

With regard to Defendant Thomas, the trial court instructed the jury to consider as mitigating circumstances:

13

(1) Whether he was the product of a dysfunctional family subject to abuse.
(2) Any history of family instability.
(3) Any proof of abandonment by a significant family member.
(4) Any evidence to show that one [of] his parents was an abuser of drugs.
(5) Any difficulty with parents' divorce or separation of parents.
(6) Any active relationship that he may have with his child although in jail.
(7) Any proof that shows that he has family members that will provide him with love and support while in prison.
(8) Any proof that, although he is in jail, he provides love and support to other members of his family.
(9) Any positive relationship that he had with other adults and children.
(10) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

After deliberations, the jury found that the State had proven the aggravating circumstance (i)(2), the defendant was previously convicted of one or more violent felonies other than the present charge, as to both Defendants. The jury further found, with regard to Defendant Bond, that the aggravating circumstance did not outweigh any mitigating circumstances beyond a reasonable doubt. In accordance with this verdict, the jury sentenced Defendant Bond to a sentence of life without the possibility of parole. With regard to Defendant Thomas, the jury found that the aggravating circumstance did outweigh any mitigating circumstances beyond a reasonable doubt. In accordance with this verdict, the jury sentenced Defendant Thomas to death for the murder of James Day.

**Issues Raised by Defendant Thomas**
**I. Sufficiency of the Evidence**

Defendant Thomas asserts that the trial court erred by failing to grant a motion for a directed verdict and judgment of acquittal following the conclusion of the State's proof and at the end of the trial. The duty of the trial judge and the reviewing court on the determination of a motion for a judgment of acquittal is the same as on a motion for a directed verdict. See State v. Torrey, 880 S.W.2d 710, 712 (Tenn. Crim. App. 1993). This Court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Moreover, "[a] motion for a judgment of acquittal made at the conclusion of the proof by the state is waived when the defendant elects to present evidence on his own behalf." State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). Accordingly, we will address the Defendant's complaints as a challenge to the sufficiency of the evidence.

14

When an accused challenges the sufficiency of the evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000). Moreover, we note that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Furthermore, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

To obtain a conviction for first degree felony murder, the State must prove the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a) (1997). In this case, the proof at trial established that the victim, James Day, was shot in the back of the head during the commission of a robbery. The proof further established that the injuries sustained by the victim as a direct result of the gunshot wound ultimately led to the victim's death. Therefore, the crime of first degree felony murder was established.

Defendant Thomas' challenge to the sufficiency of the evidence is three-fold. He asserts that (1) Angela Jackson's testimony establishing the identity of Defendant Thomas as the perpetrator is not reliable; (2) the discrepancy in the testimony of the State's medical experts as to the source of bacteria which eventually caused the death of the victim creates a reasonable doubt as to the causation of the victim's death; and (3) witness Richard Fisher identified Bond and then Thomas as the passenger in the getaway vehicle. We will address the first and third of these assertions together, and then turn to Defendant Thomas' contention regarding causation.

A. Identification of Defendant Thomas as the perpetrator

Identification of a defendant as the person who committed the offense for which he or she is on trial is a question of fact for the jury's determination upon consideration of all competent proof. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. See State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of

innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. See id.

Defendant Bond admitted that he and another person took part in the robbery of the Loomis Fargo truck and that James Day was shot during the robbery. It is undisputed that a car, matching the description of a vehicle belonging to Defendant Thomas' ex-wife, Angela Jackson, was seen parked a short distance from the crime scene and that Defendant Thomas and another person were observed getting into the vehicle and driving away. It is undisputed that Defendant Thomas, who was unemployed at the time, purchased a vehicle, jewelry, a shotgun, clothing, and opened a savings account within forty-eight hours of the robbery of the Loomis Fargo carrier. Angela Jackson identified her ex-husband in stills taken from the surveillance tape of the shooting. Ms. Jackson related that, while watching a news report on the robbery, Defendant Thomas remarked that he "grabbed the nigger by the throat and shot him."

Defendant Thomas points to Ms. Jackson's testimony that he and Defendant Bond returned to her residence between noon and 12:30 p.m. on the day of the robbery. However, the State proved that Mr. Day was robbed and shot between 12:30 and 1:00 p.m. Thus, he argues, the same testimony identifying him as the perpetrator also makes it "factually impossible" for him to have committed the crime. We are not convinced. Any discrepancy in Ms. Jackson's testimony relating to her report of the time that Defendant Thomas and Defendant Bond arrived at her apartment with the proceeds from the robbery and the actual time of the robbery is not fatal to the identification of Defendant Thomas as the perpetrator. The choice of which witnesses to believe and which to disbelieve is a matter entrusted to the jury. See Bolin v. State, 405 S.W.2d 768, 771 (1966). Furthermore, the jury is free to believe portions of a witness' testimony and to disbelieve other portions. See Wilson v. State, 574 S.W.2d 52, 55 (Tenn. Crim. App. 1978). Additionally, Ms. Jackson's testimony as to the events immediately following the robbery were corroborated by other witnesses.

Moreover, while it is true that Mr. Fisher initially identified Defendant Bond as the person he observed in the passenger side of the white getaway car, Mr. Fisher, upon request, reexamined both defendants and changed his identification to Defendant Thomas. Defendant Thomas challenged the identification on cross-examination. The jury was present during the identification and then the re-identification. The jury was in the best position to determine the credibility of this witness. Moreover, the identity of the shooter versus the driver is irrelevant, considering the theory of criminal responsibility, for purposes of determining guilt of the offense of felony murder. See Tenn. Code Ann. § 39-11-402. Irregardless of this identification, there was ample evidence from which any rational trier of fact could conclude, beyond a reasonable doubt, that Defendant Thomas was guilty of first degree felony murder committed during the perpetration of a robbery. This issue has no merit.

16

B. Cause of victim's death

Defendant Thomas claims that discrepancies between the testimony of Drs. Smith and Gardner mandate a reversal of his conviction for felony murder. Both Drs. Smith and Gardner concluded that the victim died from sepsis due to a rupture of the bladder resulting from a gunshot wound to the head. The alleged discrepancy in their testimony arises in their disparate opinions as to how the bacteria that resulted in sepsis was introduced to the victim's body.

Dr. O.C. Smith testified that he had no opinion as to where the bacteria came from and that there were several potential sources for the bacteria. Dr. Smith surmised that the bacteria leading to the infection could have existed prior to the rupture of the bladder, could have been a result of the catheterization, or could have been the result of an infection of the urinary tract near the skin opening. However, Dr. Smith concluded that the "neurogenic bladder and . . . the fact that he has problems with bladder control . . . combined with the requirement for catheterization . . . predispose[d] [the victim] . . . to have a high risk of colonization and an increased risk of infection." Dr. Cynthia Gardner, Dr. Smith's assistant, testified that "[i]t probably was – I would say with ninety-nine percent certainty, the bacteria was introduced into the bladder through catheterization." Defendant Thomas contends that this "discrepancy" raises sufficient doubt as to the cause of death of the victim. We disagree.

Both doctors testified as to the injuries sustained by the victim when he was shot and the impact of the injuries upon the victim during the intervening period until his death. Any alleged "conflict" as to the source of the bacteria is insignificant. From the testimony of both medical examiners, it appears to this Court that the infection would not have occurred but for the victim's medical condition directly caused by the shooting of the victim on April 21, 1997. That is, the uncontradicted medical testimony established that the victim eventually died as a result of the gunshot wound inflicted during the robbery. Accordingly, the evidence of causation is sufficient to support the verdict of guilt and this issue is without merit.

## II. Pretrial Motions
### A. Motion to charge jury with presumption of sentencing

Defendant Thomas asserts that the trial court erred in refusing to charge the jury that it must presume that a life sentence would be served or that the death penalty would be carried out. He argues that absent such an instruction there is a "substantial probability" that jurors would improperly speculate on the consequences of their verdict.

This is not a novel issue. Our supreme court has held that the after-effect of a verdict is not a proper consideration for the jury. See State v. Payne, 791 S.W.2d 10, 21 (Tenn.1990), aff'd, 501 U.S. 808, 111 S. Ct. 2597 (1991). The court has ruled that it is not error for a trial court to refuse to charge the jury with the very instruction requested by Defendant Thomas. See, e.g., State v. Caughron, 855 S.W.2d 526, 543 (Tenn.), cert. denied, 510 U.S. 979, 114 S. Ct. 475 (1993); Payne, 791 S.W.2d at 21. Accordingly, Defendant Thomas is entitled to no relief on this ground.

17

B. Motion for procedure governing jury composition

Defendant Thomas next contends that the trial court erred when it denied his motion for separate juries for the guilt and sentencing phases of trial. We disagree. The trial court does not have any discretion to grant a motion for separate juries for the guilt and sentencing phases of trial. See State v. Dellinger, 79 S.W.3d 458 app. at 478 n.1 (Tenn.), cert. den. 537 U.S. 1090, 123 S.Ct. 695 (2002). Indeed, Tennessee law specifically requires that following a conviction for first degree murder, a "sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt." Tenn. Code Ann. § 39-13-204(a). Moreover, our supreme court has previously rejected this argument. See Dellinger, 79 S.W.3d app. at 478-79; State v. Harbison, 704 S.W.2d 314, 318 (Tenn.), cert. denied, 476 U.S. 1153, 106 S. Ct. 2261 (1986) (rejecting the argument that a defendant is denied a fair trial by the systematic exclusion of jurors who are against the death penalty); see also State v. Hall, 958 S.W.2d 679 app. at 717 (Tenn.1997) (rejecting the argument that the manner of selecting "death qualified" jurors results in juries that are prone to conviction).

Defendant Thomas also contends that a criminal defendant's constitutional rights are violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath. This issue, similarly, has been decided adversely to the Defendant. See Dellinger, 79 S.W.3d app. at 479 n.2; State v. Hutchison, 898 S.W.2d 161, 167 (Tenn.1994), cert. den. 516 U.S. 840, 116 S.Ct. 137 (1995), (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985)). Accordingly, Defendant Thomas is entitled to no relief on these grounds.

C. Motion to declare Victim's Rights Bill unconstitutional

Defendant Thomas asserts that Tennessee Code Annotated section 39-13-204(c), which allows the introduction at sentencing of "victim impact" evidence, violates the constitutional doctrine of separation of powers. This identical argument is raised by Defendant Thomas in his general challenge to the constitutionality of the Tennessee death penalty statutes. We reject this claim. See infra Section XVII (J).

D. Motion to dismiss indictment based on common law
"one year and one day rule"

Defendant Thomas moved the trial court to dismiss the indictment based upon the common law year-and-a-day rule because the victim's death occurred more than one year and one day after the crime was committed. The common law rule no longer applies in Tennessee. See State v. Rogers, 992 S.W.2d 393, 401 (Tenn. 1999). This claim is without merit.

18

### E. Motion to use jury questionnaires including specific questions about the death penalty

Defendant Thomas filed a motion for a jury questionnaire specifically including death penalty questions. The trial court permitted a jury questionnaire to be used but declined to include death penalty questions. Defendant Thomas claims that, in so doing, the trial court erred.

The trial court committed no error in denying Defendant Thomas' request. A trial court is vested with great discretion in determining how voir dire examination will be conducted, and the court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of the discretion. See State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993), cert. den. 510 U.S. 1215, 114 S.Ct. 1339 (1994); State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992), cert. den. 507 U.S. 954, 113 S.Ct. 1368 (1993). We find no abuse of discretion in the method of voir dire employed in this case.

### F. Motion to dismiss on double jeopardy grounds

Defendant Thomas asserts that his trial in state court violates the double jeopardy provisions of the Fifth Amendment to the United States Constitution, Article 1 section 10 of the Tennessee Constitution, and Article 14 section 7 of the International Covenant on Civil and Political Rights because the Defendant's federal charges arise from the same criminal event.

It is a well-established principle that "a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one . . . [P]rosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.'" United States v. Wheeler, 435 U.S. 313, 317, 98 S. Ct. 1079, 1082-83 (1978). Defendant Thomas argues, however, that the dual sovereignty doctrine is violative of the Tennessee constitution and argues for its abrogation. However, our supreme court has specifically upheld and determined to adhere to this doctrine of dual sovereignty, reasoning as follows:

> There is no question but that such a procedure does not subject the defendant to double jeopardy insofar as the guaranty of due process in the 14th amendment of the federal constitution is concerned. Bartkus v. Illinois, 359 U.S. 121, 79 S. Ct. 676, 3 L.Ed.2d 684 (1959). While the rationale of this case - that the state and federal governments are distinct sovereignties, and thus the punishment of a single act by ach is not double jeopardy - has been criticized, a similar approach has provided the basis for a more recent case, which would imply that Bartkus' analysis of the issue is still valid. See United States v. Wheeler, 435 U.S. 313, 98 S. Ct. 1079, 55 L.Ed.2d 303 (1978). This court is bound by the decisions of the United States Supreme Court concerning the proper interpretation of the federal constitution. Townsend v. Clover Bottom Hospital and School, 560 S.W.2d 623 (Tenn. 1978).

19

The double jeopardy provision of the Tennessee constitution, Article I, § 10, affords the defendant no greater protection. In the past, this provision has been interpreted to permit successive state and federal prosecutions on the basis of the same "dual sovereignties" analysis employed in Bartkus, supra, and, given the need for stability in constitutional interpretation, we see insufficient cause to depart from that precedent now.

Lavon v. State, 586 S.W.2d 112, 113-14 (Tenn. 1979). The Lavon court further explained that any modification or abandonment of the dual sovereignty doctrine must be accomplished through legislative action. See id. at 115. Such legislative action has yet to take place; thus, the doctrine of dual sovereignty remains in effect.

Additionally, Defendant Thomas asserts that the State's prosecution violates the International Covenant on Civil and Political Rights (ICCPR), which is an international treaty of governing nations. This Court addressed and rejected this identical claim in State v. Carpenter, 69 S.W.3d 568, 578-579 (Tenn. Crim. App. 2001), cert. den. 535 U.S. 995, 122 S.Ct. 1557 (2002). Defendant Thomas has not convinced this Court to sway from this decision. This claim is without merit.

### III. Continuance of Case Due to Events of September 11, 2001

On September 12, 2001, the trial court continued the trial in this matter until September 17, 2001. Defendant Thomas maintains that the trial court erred by failing to continue the matter for a longer period of time following the events of September 11, 2001.

The granting of a continuance rests within the sound discretion of the trial court. See State v. Russell, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. See id. "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995).

In the present case, the trial court's denial of a continuance was not error. The trial was scheduled to begin on September 10, 2001. On September 10, 2001, eleven jurors were tentatively selected and the matter continued to September 11 for a second day of jury selection. Although not evidenced by the record, September 11, 2001, is the date of the terrorist attacks on New York City and Washington, D.C. On September 11, 2001, eighteen jurors were tentatively selected. At some point on that day, defense counsel moved for a continuance. The trial court continued the trial until September 17. While the events of September 11, 2001, were of unquestionable national importance, Defendant Thomas fails to explain how those events affected his trial. Nothing in the record before us indicates that those events had any effect on the proceedings other than to delay them for one week. Thus, Defendant Thomas has failed to show how he was prejudiced by the trial court's refusal to grant a continuance for a longer period of time. We find neither error nor abuse of

discretion.  This issue is without merit.

## IV.  Juror Pannell

Defendant Thomas contends that the trial court erred by excusing Prospective Juror Gary Pannell for cause based upon his view regarding the death penalty.  During voir dire, the following colloquy occurred:

| | |
|---|---|
| MS. WEIRICH: | Mr. Pannell, same question to you, if the State of Tennessee proves the aggravating circumstances, beyond a reasonable doubt, and proves that they weigh more than the mitigators, again, beyond a reasonable doubt, can you sentence one or both of the defendants to death? |
| PROSPECTIVE JUROR: | I really don't think so. |
| . . . | |
| PROSPECTIVE JUROR: | I had a hard time dealing with it last night, soul searching and everything. |
| MS. WEIRICH: | All right. |
| PROSPECTIVE JUROR: | And there have been articles in the paper recently about planted evidence and stuff like that, that it makes it hard for me to say that I would agree to a death sentence on something I didn't witness myself. |
| MS. WEIRICH: | That's fine. |
| PROSPECTIVE JUROR: | Or to hear the person charged with the crime to personally admit to it himself. |
| MS. WEIRICH: | All right.  So you couldn't follow the law in the State of Tennessee if what I have told you would be the law that you would have to follow according to [Judge] Dailey's instructions? |
| PROSPECTIVE JUROR: | Well, you know you have to listen to witnesses. |
| MS. WEIRICH: | Yes, sir. |

PROSPECTIVE JUROR: Okay. And that's where I would have a problem, is taking what they are saying, and saying, "Okay, what they are saying is true," which I don't know–

MS. WEIRICH: All right.

PROSPECTIVE JUROR: And to me, death is – it's a permanent thing.

MS. WEIRICH: Yes, sir. Thank you.

PROSPECTIVE JUROR: You don't come back with it.

MS. WEIRICH: Thank you.

THE COURT: Any questions, Mr. Manis?

MR. MANIS: No questions, Your Honor.

THE COURT: Mr. Scholl?

MR. SCHOLL: I do, Your Honor.
Sir, let me ask you this: Are there circumstances where you feel you could give the death penalty? You mentioned you wouldn't feel comfortable doing it unless you actually saw it or unless you heard someone admit to it. Are there circumstances where you could give that punishment?

PROSPECTIVE JUROR: That's the only two that I can thin[k] of right now.

MR. SCHOLL: So there are some circumstances where you could give that punishment if it actually showed; is that correct?

PROSPECTIVE JUROR: That's right.

MR. SCHOLL: I have no further questions, Your Honor.

THE COURT: So you're not foreclosing the possibility of giving the death penalty. Is that correct, Mr. Pannell?

PROSPECTIVE JUROR: That's correct.

22

THE COURT: You're just stating that you would have to see sufficient proof to satisfy you that the aggravating circumstances outweigh the mitigating circumstances.

PROSPECTIVE JUROR: Sufficient proof in my eyes would be what I witnessed myself or what the person charged with the crime – if they said that they did it, yes, I could go along with it.

THE COURT: Let me ask you this: If you felt that the state had proven the aggravating circumstance that they allege – you're satisfied that they have proven that and that it outweighed the mitigation – the mitigating circumstances – but neither of these criteria that you set forth existed, are you saying, then, that even though you felt that the state had proven their aggravating circumstances, you still could not follow the law and impose the death penalty?

PROSPECTIVE JUROR: (No audible response)

[THE COURT:] Do you follow what I'm saying?

PROSPECTIVE JUROR: (No audible response)

[THE COURT:] You set up two criteria that you say are the only two by which you could consider voting for the death penalty, and I'm saying what happens if, in your mind, if you determine that the state has proven, beyond a reasonable doubt, the existence of the aggravating circumstance they allege, and you further find, in your mind, that that aggravating circumstance does, indeed, outweigh, beyond a reasonable doubt, any mitigating circumstances that have been presented – if you find that the law had been satisfied in that regard as it's set up by the legislature, but you find that these two circumstances that you set forth aren't part of this process – don't exist in this process, are you saying that because of that, you could not go forward an[d] impose the death penalty?

PROSPECTIVE JUROR: I would have a hard time taking what I would hear coming from witnesses' accounts and everything because, just like I said, just last week in the paper about some incidents down in Florida —

23

| | |
|---|---|
| THE COURT: | Well, we wouldn't want to get into what was in the paper because we don't try cases in the paper or on TV. |
| PROSPECTIVE JUROR: | Okay. It's planted evidence – |
| THE COURT: | Well– |
| PROSPECTIVE JUROR: | – people can say anything — |
| THE COURT: | Okay. Thank you, Mr. Pannell . . . |

The trial court then asked the parties to approach the bench, at which time the State renewed its challenge for cause. After considering argument by counsel for Defendant Thomas, the trial court excused Prospective Juror Pannell for cause, finding:

> I think that his responses, in their totality – he, at best, has given some sort of qualified statement that he could, under his own perceived limited circumstances follow the law; and under the law, that's not good enough. He conceded that if the state proved what they were required to prove under the statute but it didn't meet his self-appointed criteria, then he couldn't go forward and follow the law. And I don't think that's what our system requires of a juror. And I – that's just the way he feels, and that's fine; but I'll note your exception. I'm going to go ahead and excuse him.

In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is whether the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and his or her oath. See State v. Austin, 87 S.W.3d 447, 472-73 (Tenn. 2002), cert. den. 71 USLW 3679, 123 S.Ct. 1899 (2003), (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985)). Moreover, this standard does not require that a juror's biases be proved with "unmistakable clarity." See id. at 473. However, the trial judge must have the definite impression that a prospective juror could not follow the law. See Hutchison, 898 S.W.2d at 167 (citing Wainwright v. Witt, 469 U.S. at 425-26, 105 S. Ct. at 853). Finally, the trial court's finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. See State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989), cert. denied, 493 U.S. 1036, 110 S. Ct. 1758 (1990).

After reviewing the answers of Prospective Juror Pannell, we conclude that his answers left no leeway for rehabilitation. See State v. Strouth, 620 S.W.2d 467, 471 (Tenn. 1981), cert. denied, 455 U.S. 983, 102 S. Ct. 1491 (1982). Both the trial court and the prosecutor extensively questioned this prospective juror as to whether he could apply the law to the evidence and consider all forms of punishment in this case. Juror Pannell was consistent in responding that he would not impose the

death penalty unless his own criteria were satisfied. This prospective juror met the standard for dismissal. See Hutchison, 898 S.W.2d at 167. We see no error.

## V. Photographs of Victim
### A. Photograph of Victim While Alive

Defendant Thomas submits that it was error for the trial court to permit introduction of a photograph of the victim while alive. At trial, defense counsel objected to introduction of the photograph. The photograph was taken after the April 1997 shooting but prior to the victim's death in October 1999. The trial court overruled the objection stating:

> I think it's, first of all, relevant in that the state, of course, has the burden of proving that an individual – a living, breathing, human being was killed in these events. And the photograph, itself, is again, a very neutral one. It's black and white. It doesn't have family members around. He's not in a choir robe or a scout uniform or military uniform or anything of that sort. This is a very neutral sort of photograph – no wheelchair – nothing that would be designed to elicit sympathy . . . . I'll allow it to be used.

During the guilt phase of the trial, the photograph of the victim was introduced through the testimony of Betty Gay, an employee of Walgreens. On appeal, Defendant Thomas contends that admission of an 8 by 10 black and white photograph of the victim taken during his lifetime was introduced for the sole purpose of invoking the sympathy of the jury and was error. The State responds that the photograph was relevant to rebut Defendant Thomas' defense that it was Mr. Day's physical health, including obesity, that caused his death, rather than the gunshot.

The admission of photographs is generally discretionary with the trial court and absent an abuse of that discretion, will not result in the grant of a new trial. See State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In State v. Nesbit, 978 S.W.2d 872 at app. 901-02 & n. 2 (Tenn. 1998), cert. den. 526 U.S. 1052, 119 S.Ct. 1359 (1999), a capital case involving almost the identical issue, our supreme court adopted this Court's conclusion that, although the requirement of a reasonable creature in being has been removed from the current criminal code, admission of a family portrait of the victim was not error because it was relevant to establish the corpus delicti, including the identity of the person alleged to have been killed. In Bolden v. State, 140 Tenn. 118, 120, 203 S.W. 755 (Tenn. 1918), our supreme court held that the evidence necessary "to establish the corpus delicti in cases of homicide must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed . . . ." (emphasis added). Thus, the photograph was relevant and we find no reversible error in its admission during the guilt phase of the trial.

### B. Photographs of Victim Post-Mortem

During the re-direct examination of Faye Day, the victim's widow, the State introduced two post-mortem photographs depicting the victim's face and back respectively. The State asserted that the photographs were relevant in light of Mrs. Day's testimony describing how her husband "blew up" shortly before his death and in light of questions by defense counsel regarding the victim's

obesity. The trial court, reflecting upon Mrs. Day's testimony, permitted introduction of the photographs, finding:

> I think in light of her testimony regarding his condition those last couple of days, I think they're relevant at this point – the probative value clearly outweighs whatever prejudicial effect there would be. There's nothing graphic or bloody[.]

Defendant Thomas now contends that admission of these photographs was error. Without reference to the specific photographs complained of and without argument to those photographs actually introduced, Defendant Thomas complains that the "gruesome photographs of the victim violates the Defendant's rights under the federal and state constitutions. . . ." The State properly argues that Defendant Thomas has waived this issue for failure to offer citation to the record. See Tenn. Ct. Crim. App. R. 10(b). Notwithstanding procedural waiver of this issue for noncompliance with the Rules of this Court, we elect to address the issue on its merits.

As previously stated, Tennessee courts have liberally allowed the admission of photographs in both civil and criminal cases. See Banks, 564 S.W.2d at 949. Accordingly, the admissibility of photographs lies within the discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. See id.; see also State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999), cert. denied, 531 U.S. 837, 121 S. Ct. 98 (2000). However, a photograph must be relevant to an issue that the jury must decide before it may be admitted into evidence. See State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467 (1999); State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.1993); see also Tenn. R. Evid. 401, 402. Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character. See Banks, 964 S.W.2d at 950-51.

Notwithstanding this broad interpretation of admissibility, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. See id. Additionally, the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact. See Vann, 976 S.W.2d at 102-03; see also Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). In this respect, we note that photographs of a murder victim are prejudicial by their very nature. However, prejudicial evidence is not per se excluded; indeed, if this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. See Banks, 564 S.W.2d at 951.

The Defendant asserts that post-mortem photographs of the victim should not have been admitted because they were especially gruesome and inflammatory. The purpose for introducing photographs into evidence is to assist the trier of fact. "As a general rule, the introduction of photographs helps the trier of fact see for itself what is depicted in the photograph." State v. Griffis, 964 S.W.2d 577, 594 (Tenn. Crim. App. 1997). The trial court ultimately determined that the photographs were relevant to support Mrs. Day's testimony regarding the victim's condition during

the last days of his life. Dr. Gardner, likewise, used the photographs during her testimony to illustrate that the victim suffered from extensive fluid retention at the time of his death. The photographs further refuted the theory of the defense that the victim's death was the result of his obesity. We conclude that the photographs were relevant to supplement the testimony of the victim's wife and the medical examiner. Although the photographs are not particularly pleasant to view, neither are they particularly gruesome. We find that the probative value of the photographs is not outweighed by their prejudicial effect and the trial court did not abuse its discretion in allowing their admission. See Banks, 564 S.W.2d at 949. Defendant Thomas is not entitled to relief on this issue.

## VI. Evidence from Federal Proceedings

Defendant Thomas raises several claims of error arising from the admission of evidence that was also used in his prior federal trial. First, Defendant Thomas complains that the trial court erred in overruling his objection concerning the exhibit stickers placed on exhibits used in Defendant Thomas' prior federal trial and further erred by not providing the jury a curative instruction. Next, he asserts as error that the trial court erred by permitting introduction of the video of the crime even though the prosecution had failed to provide a proper foundation or chain of custody for the admission of the videotape. Third, Defendant Thomas contends that the trial court erred by permitting the jury to read a transcript of Mr. Day's previous testimony as Assistant United States Attorney Tony Arvin read the transcript aloud. Next, Defendant Thomas contends that the date of Defendant Bond's guilty plea and the later date of Mr. Day's testimony provided the inference that the federal proceeding went forward against Defendant Thomas without Defendant Bond. Finally, Defendant Thomas complains that the trial court erred by overruling his objections to Defendant Bond's counsel asking questions regarding Bond's guilty plea in federal court. As argument on these claims, Defendant Thomas makes the general assertion that this evidence was not relevant. The State asserts that Defendant Thomas has waived these claims for failing to make proper argument. See Tenn. Ct. Crim. App. R. 10(b). Additionally, the State contends that Defendant Thomas has failed to demonstrate that the trial court abused its discretion with respect to the admission of any of this evidence. The State's position is well-taken. Nonetheless, we elect to review the admission of the contested evidence on its merits.

Rulings on the admissibility of evidence based on its relevance are entrusted to the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

### A. Evidence stickers from federal proceeding.

Initially, we note that Defendant Thomas fails to reference the record regarding objections made to the introduction of exhibits that had been previously used during his federal trial. The State, noting this omission, also fails to cite to the objections, if any, made. Despite the reference made at the motion for new trial hearing that this issue was thoroughly addressed at trial, this Court has been unable to locate any objections to these exhibits, although examples of the trial court's curative measures are found. Irregardless, Defendant Thomas claims that the exhibits were prejudicial

27

because they contained exhibit stickers from the previous trial. Numerous exhibits contain stickers indicating that they had previously been exhibits. No other information is provided on the exhibit tags. Assistant United States Attorney Arvin testified that there were proceedings in federal court. With regard to Defendant Thomas, the jury did not know where or how the exhibits were used previously, the name of any other defendant, or the outcome of any hearing. In short, even if any prejudice resulted from the use of these exhibits, such prejudice was slight and did not substantially outweigh the probative value of this evidence. See Tenn. R. Evid. 403.

### B. Videotape of the crime

A videotape of the incident was recorded by Walgreens' security camera and was introduced at trial through the testimony of Charles Young. Defendant Thomas objected, asserting lack of foundation and lack of chain of custody. The trial court found:

> Well, chain of custody is not relevant. It's just like with a photograph; if the witness can state that he's viewed this film, and it accurately reflects what it purports to show the[n] there is no chain of custody problem like there would be if you had drugs or something that you needed to maintain – preserve the integrity of the item. As far as foundation is concerned, [Charles Young] is the assistant manager of the store. He said he was familiar with the cameras and how they were pointed and how they operated, so I'll note your exception.

We agree with the trial court. This issue has no merit.

### C. Providing jurors with transcript

During the State's case-in-chief, Assistant Unites Sates Attorney Tony Arvin read to the jury a transcript of Mr. Day's testimony given on November 9th during the federal proceedings. Simultaneously, the jurors were each provided a copy of the transcript to read. Although Defendant Thomas conceded that the reading of Mr. Day's prior testimony was permissible, he objected to the handing of the transcript to the jury. The trial court responded, "this is not Mr. Day testifying; it's a bit harder for jurors, I think, to follow because it's some sort of neutral presentation of what is otherwise testimony; and so I think it will aid - in my opinion, it will aid the jury in following what is being read." Thus, the trial court overruled Defendant Thomas' objection. However, the trial court further determined that the jury was not to have a written copy with them in the jury room "because that would give undue weight to a written document which is, in essence, testimony – nothing more nothing less."

We find no abuse of discretion in the trial court's ruling on this matter. This issue is without merit.

### D. Date of Bond's guilty plea and later date of Day's testimony, and

E.  Questioning by Bond's counsel regarding guilty plea

Defendant Bond pled guilty in federal court on November 4, 1998, to the robbery of James Day.  Mr. Day subsequently testified about the robbery on November 9, 1998.  At trial, Defendant Thomas was concerned that the evidence of the two dates would lead to the inference that, as of November 9, 1998, "the [federal] proceeding went forward against [Defendant] Thomas without [Defendant] Bond."  Following argument by defense counsel, the trial court found, "So long as you – as long as [it] is indicated to the jury; that up until November the 4, [Bond] was, indeed, a party to the [federal] proceeding.  At that time he entered a guilty plea to these events.  And so at the time that Mr. Day testified on November the 9th, in light of the fact that [Bond] entered a guilty plea to these very events five days earlier, he was not, at that time, an actual party to the proceedings."  With reference to an objection lodged by Defendant Thomas that this ruling "gives the indication that they were together in that proceeding and that [Defendant Bond] was able to plead guilty and that [Defendant Thomas] possibly disputed something," the trial court further found:

> First of all, the fact that the transcript contains references to the jury and even the court, I can only say that we made an effort . . . to avoid referring to the previous proceeding as a trial or what the outcome might have been, who the actual parties were, what the sentence might have been that these men received.
>
> The references to jury and court in the transcript . . . could have been addressed and could have been deleted.  The entry of this testimony comes as no surprise to anyone in this courtroom.  You all have had, of course, the transcript for years now, and we addressed the issue of the state's desire to enter Mr. Day's testimony . . . .  So there's been time for you all to review and request that those matters – those references be deleted had you felt . . .that it was unduly prejudicial to leave them in.
>
> I don't think it's as prejudicial for them to have been in because we're still not referring to precisely what the proceedings [were], what the results were, or anything of that sort. . . .
>
> With regard to what [Defendant Bond] is asking to be allowed to ask, it's already in the record at this point. . . . Mr. Arvin has already testified to the date on which Mr. Bond entered his guilty plea to these events, not to a specific trial that was about to begin. . . .  He's entered a guilty plea . . . on the 4th of November. . .and that Mr. Day's testimony . . . occurred on the 9th of November.
> . . .
> And so, . . . he's asking to . . . re-ask what's already in the record and already before the jury . . . and I don't know that there is any real prejudice to your client.

The trial court then limited the manner in which Defendant Bond could make inquiry as to Defendant Bond's status in the proceeding at the time of Mr. Day's testimony.

Again, we see no abuse of discretion in the trial court's ruling on this matter.  Defendant Thomas is not entitled to relief as to these claims.

## VII. Restriction on Impeachment of Angela Jackson

Defendant Thomas complains that it was error for the court to refuse to allow Russell Carpenter and William Upchurch to testify that Angela Jackson had told them that she was going to make sure that Defendant Thomas went to jail. The State responds that this allegation is unsupported by the record.

A review of the direct examination of Russell Carpenter reveals that counsel for Defendant Thomas questioned Mr. Carpenter as to the status of the Thomas/Jackson relationship. Specifically, the following questions were posed of Mr. Carpenter:

> Q:     Mr. Carpenter, . . . Did [Angela Jackson] threaten . . . say she was going to pay Andrew Thomas back?
>
> A:     Yes, sir.
>
> Q:     Was she angry about their breakup?
>
> A:     Yes, sir.
> Q:     Did she make a comment that if she couldn't have him, no one else would?
>
> A:     Yes, sir.

Likewise, a review of the testimony of William Upchurch reveals that counsel for Defendant Thomas questioned Mr. Upchurch as to the status of the Thomas/Jackson relationship. Specifically, the following colloquy occurred:

> Q:     Did you ever hear Ms. Jackson make any statements regarding Andrew Thomas?
>
> A:     Yes.
>
> Q:     What statements?
>
> A:     Saying she were gonna pay him back.

The only objection noted in the record is the State's objection to the open-ended questions asked by defense counsel to Russell Carpenter, that is, "Did you . . . have any occasion to talk to Angela Jackson?" and "What did she say to you?" To the latter objection, the trial court stated,

> I'm going to let you lead if he's going to say the same thing, basically, that others said; that she said she's going to pay him back. But to just ask an open-ended question, "What did she say?" – we might be here for three hours listening to all sorts of . . . things about a relationship that wouldn't be relevant. But with regard to

that one narrow and specific comment that rebuts – or is purported to rebut what she testified to, I'll allow you to lead and get right to that.

No question was posed by defense counsel regarding Jackson's alleged threats to send Defendant Thomas to jail and the trial court did not limit the same. Any testimony of this nature was only briefly touched on by defense counsel on recross-examination of Angela Jackson. Called in rebuttal, Angela Jackson denied ever threatening to get Andrew Thomas. On recross-examination, defense counsel specifically asked Ms. Jackson regarding threats by Ms. Jackson that she would see that Defendant Thomas went to jail.

The record does not support Defendant Thomas' claim that the trial court improperly restricted his attempt to elicit impeachment evidence against Ms. Jackson. This claim is without merit.

### VIII. Refusal to Voir Dire Juror Regarding Relationship with Witness

After the jury returned its verdicts but prior to the penalty phase, Defendant Thomas alerted the trial court that one of the jurors worked with defense witness Russell Carpenter. The trial judge responded that he

> [did not] think that the defense witnesses were mentioned during voir dire in terms of asking the jurors whether they knew potential witnesses.
>  . . .
> And so that certainly can't be held against the juror. I mean she didn't refuse to reveal any knowledge of a relationship to any of your witnesses because those witnesses were never [identified] during voir dire. . . [f]or them to respond to. And if it's just a matter of her having worked with this witness, who wasn't actually a fact witness. His role was very minimal.

The following colloquy then occurred:

| | |
|---|---|
| MR. SCHOLL: | Everybody stop just for a second. Not my client, the juror and one of the witnesses know each other. That came to me through my client – the information. |
| MS. NICHOLS: | Have you talked to Mr. Carpenter – how he found out or something that – |
| MR. SCHOLL: | Evidently Mr. Bond and Mr. Thomas both talked to Mr. Carpenter, and Mr. Carpenter said that he knew this person. And that's the extent of it. |
| THE COURT: | Okay. Just for the record, though, because I clearly misunderstood you when you first – |
| MR. SCHOLL: | I'm sorry. |

THE COURT: I thought your client knew him. I thought your client's relatives knew them, I thought there was an actual relationship there. But none of that's true. The sole statement is that your witness, Russell Carpenter, who was the final witness for the defense . . . [w]orked with this juror at one time.

MR. SCHOLL: Right, and knows her.

THE COURT: And knows her and didn't particularly get along well with her.

MR. SCHOLL: Right.
. . .

MS. MCCLUSKEY: Anthony Bond talked to Mr. Carpenter on the phone last night, and Mr. Carpenter said he's apparently seen that woman before because one day when Mr. Carpenter was being dropped off at work or dropped off from work, Mr. Bond was there. And Mr. Carpenter was saying, "That woman doesn't like me, and she saw me with you before."

THE COURT: Well, that's – there's no mention, there again, of the witnesses during voir dire. There's nothing to suggest that this juror cannot be, has not been totally fair and impartial in this case, and so I'll note your statements for the record, but I don't think it has any bearing or effect, whatsoever, on this case.

Defendant Thomas now claims that the trial court erred in failing to conduct a voir dire of this juror. Specifically, Thomas alleges that this juror should have been individually voir dired regarding her knowledge of the defense witness and her ability to be impartial. The State responds: first, the issue is waived because Defendant Thomas never requested that the juror be individually voir dired, see Tenn. R. App. P. 36(a); second, the issue is waived for failing to preserve the issue in the motion for new trial, see Tenn. R. App. P. 3(e); and third, the issue is waived for failing to make an offer of proof through the testimony of Russell Carpenter, see Tenn. R. App. P. 36(a); State v. Powers, 101 S.W.3d 383, 415 n.5 (Tenn. 2003).

The State's position regarding waiver is well-taken. Additionally, Defendant Thomas, while stating general propositions of law regarding voir dire, fails to relate to this Court why the trial court's failure to individually voir dire this juror is error. See Tenn. R. App. P. 27(a)(7). Notwithstanding waiver, there is nothing in the record to indicate that the juror withheld information from the court regarding an alleged relationship with witness Carpenter. Moreover, the relationship remains just that, an allegation. Defendant Thomas failed to make an offer of proof supporting his allegation. This issue is without merit.

### IX.  Testimony of John Hibbler

During its case-in-chief, the State called John Hibbler as a witness.  Mr. Hibbler is the owner of the car lot where Defendant Thomas purchased his pink box Chevy immediately following the robbery and shooting of James Day.  On cross-examination, Defendant Thomas sought to elicit information regarding problems he and Angela Jackson were having in their marriage.  The State objected and Defendant Thomas responded that the testimony was relevant to rebut the anticipated testimony of Angela Jackson.  The trial court found that, should Mr. Hibbler recall Defendant Thomas mentioning marital difficulties with Ms. Jackson, that testimony would be hearsay.  The following questioning then occurred:

> Q:      Mr. Hibbler, as I was asking before, you had conversations with Mr. Thomas after the sale of this car.  Is that right?
>
> A:      Yes.  I had conversations with him.
>
> Q:      And the conversations with Mr. Thomas, he asked you if he could get a new title for that car because he was having problems with the title.  Is that correct?
>
> MS. WEIRICH:       Object, Your Honor, to hearsay.
>
> THE COURT:       Sustained.  Isn't that what we just discussed?

A bench conference ensued, during which the trial court sustained its prior ruling that knowledge of marital difficulties between Defendant Thomas and Angela Jackson obtained during Mr. Hibbler's discussion with Thomas constituted hearsay.

On appeal, Defendant Thomas complains that the trial court erroneously concluded that Mr. Hibbler's testimony about Thomas' marital problems with Ms. Jackson was hearsay.  Thomas asserts that such statements were not offered for the truth of the matter asserted but merely to show the subject of the conversation.   The State responds that, if the testimony was offered to show the subject of the conversation, such statement was not relevant to any issue regarding the robbery and murder of James Day.

Our Rules of Evidence provide that "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). If an out-of-court statement is not offered to prove the truth of the matter asserted, such as a statement offered for impeachment purposes, it is not hearsay. See State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993), cert. den. 510 U.S. 1215, 114 S.Ct. 1339 (1994).  "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court."  State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). Accordingly, this Court will not reverse a trial court's

ruling regarding the admission or exclusion of hearsay evidence absent a clear showing that it abused its discretion. See id.

Testimony regarding possible bias of a witness is admissible pursuant to Tennessee Rule of Evidence 616 which provides that "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. However, although extrinsic evidence is admissible to prove bias or prejudice, Defendant Thomas cites no cases from any jurisdiction, and we have found none, holding that witness bias may be proven by hearsay. If the testimony of Mr. Hibbler was offered to establish Ms. Jackson's prejudice against Defendant Thomas, it was hearsay. Thus, the trial court did not abuse its discretion by refusing to permit introduction of hearsay testimony regarding marital difficulties between Defendant Thomas and Angela Jackson.

## X. Fingerprint Testimony

As his next claim of error, Defendant Thomas asserts that the trial court erred in permitting Officer Sims to testify despite stipulation that the fingerprint found on the stolen getaway car matched Defendant Bond. Thomas asserts that, after the stipulation, any testimony by the fingerprint expert was cumulative. The State responds that Defendant Thomas has waived this issue by failing to enter a contemporaneous objection to Officer Sims' testimony. See Tenn. R. App. P. 36(a). The State further contends that, although Defendant Bond did object to Officer Sims offering any testimony in lieu of the agreed upon stipulation, the objection by a co-defendant fails to preserve the issue on appeal for Defendant Thomas. See State v. Steve Bradford, No. 03C01-9607-CR-00278, 1998 WL 24417, at *6 (Tenn. Crim. App., Knoxville, Jan. 20, 1998). Although the State's position is well-taken, we elect to review the issue on its merits.

> The trial court, in response to the expressed objections of Defendant Bond, found:
> I think that the state has a definite interest in demonstrating to the jury not only the specific facts involved here – that the print does belong to your client, but also the larger fact that – who the police officers were that worked on the case, the fact that the police were working on the case, the fact that all of this was a coordinated effort by police officers, lest some suggestion be made, in final argument, that the police dropped the ball. . . . I think the state has an interest in putting on proof to satisfy the jury that things were done and done right by the proper personnel. And so to that extent, I think there is an interest . . . in at least putting a face with a name. By having Mr. Sims take the stand, the jury can see that Sergeant Hulley was accurate when she stated it was forwarded on to latent prints, and he can state – identify the exhibit as the one he examined. And then the stipulation can kick in, and he doesn't have to go any further than that.

After the stipulation was introduced, Officer Sims testified briefly to explain the nature of a latent print and the process by which he receives prints for review. He further related that not all prints that are lifted have value in the sense that they can be matched.

34

As previously indicated, "[t]he admissibility of evidence is generally within the broad discretion of the trial court; absent an abuse of that discretion, the trial court's decision will not be reversed." State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). We review this issue, therefore, under an abuse of discretion standard.

Defendant Thomas complains that Officer Sims' testimony was cumulative with regard to the stipulation as to Defendant Bond's fingerprints. To the extent that Sims' testimony was cumulative, if at all, we cannot conclude that the testimony was unfairly prejudicial to Defendant Thomas. Accordingly, the trial court did not abuse its discretion in permitting introduction of the testimony.

### XI. Failure to Charge Accomplice of Angela Jackson

Next, Defendant Thomas complains that the trial court erred by failing to instruct the jury with an instruction concerning accomplice testimony with regard to Angela Jackson. At the close of proof, defense counsel requested that an accomplice instruction be provided with regard to Angela Jackson. The trial court denied the request, finding that Angela Jackson failed to fit the legal definition of an accomplice, in that there was no proof that she united with Defendant Thomas in the commission of the crime. Although the court recognized that Ms. Jackson did participate in the spending of the money after the fact, the court noted that this was not enough to elevate Ms. Jackson to accomplice status.

"An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The test generally applied in determining whether a witness is an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant. See id. In this state, if the offense in question was not committed by the person's own conduct, the person may, nonetheless, be criminally responsible as a principal to the offense if the person solicits, directs, aids, or attempts to aid another person to commit the offense. See Tenn. Code Ann. § 39-11-402(2). The proof in this case fails to establish that Angela Jackson solicited, directed, aided, or attempted to aid the Defendant in committing murder and/or aggravated robbery. Her actions in allowing the Defendant into her home after the crimes were committed, going shopping with the stolen money and receiving part of the proceeds for herself, do not make her a principal to the offense of murder or robbery of the victim. Thus, the Defendant's argument that it was error for the trial court not to submit an accomplice instruction to the jury is without merit, because the facts do not demonstrate that Angela Jackson was an accomplice.

### XII. Failure to Instruct on Specific Mitigators

Next, Defendant Thomas complains that the trial court declined to instruct the jury as to the following non-statutory mitigating circumstances: (1) residual doubt as to the defendant's guilt; (2) the defendant was the product of a dysfunctional family subject to abuse; (3) the defendant had a history of family instability; (4) the defendant had a fundamental lack of a stable relationship with his parent or step-parent; (5) his parents were divorced; (6) any regret for his past acts; (7) his family could not feed itself on its own; and (8) any positive influence he may have had on others. A review

of the charge submitted to the jury reveals that the trial court instructed the jury as to the following mitigating circumstances:

(1) Whether he was the product of a dysfunctional family subject to abuse.
(2) Any history of family instability.
(3) Any proof of abandonment by a significant family member.
(4) Any evidence to show that one [of] his parents was an abuser of drugs.
(5) Any difficulty with parents' divorce or separation of parents.
(6) Any active relationship that he may have with his child although in jail.
(7) Any proof that shows that he has family members that will provide him with love and support while in prison.
(8) Any proof that, although he is in jail, he provides love and support to other members of his family.
(9) Any positive relationship that he had with other adults and children.
(10) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The charge reveals that five out of the eight requested instructions were provided to the jury. The factors not specifically included in the charge are: (1) residual doubt, (2) the family's inability to feed itself, and (3) the Defendant's regret for past acts.

With respect to the first of these factors, the Eighth Amendment of the United States Constitution does not require a lingering or residual doubt instruction. See Franklin v. Lynaugh, 487 U.S. 164, 173-74, 108 S. Ct. 2320, 2326-28 (1988). In Franklin, the United States Supreme Court stated:

Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. "Residual doubt" is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." . . . Nothing in our cases mandates the imposition of this heightened burden of proof at capital sentencing.

Id. at 188 (O'Connor, J., concurring) (citations omitted). See also State v. Bigbee, 885 S.W.2d 797, 813 (Tenn. 1994). Accordingly, the trial court did not commit a federal constitutional error in denying Defendant Thomas' request for an instruction on lingering or residual doubt.

Defendant Thomas argues that the trial court was required to grant his request for this instruction under state law. Our supreme court has determined that residual doubt is a nonstatuory mitigating circumstance. See State v. McKinney, 74 S.W.3d 291, 307 (Tenn. 2002); State v.Hartman, 42 S.W.3d 44, 55-56 (Tenn. 2001). Our criminal code provides, in relevant part, that

> The trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j).

Tenn. Code Ann. § 39-13-204(e)(1).[2] Thus, where the issue of residual doubt is raised by the evidence, a jury instruction is appropriate. See State v. Odom, 928 S.W.2d 18, 30 (Tenn. 1996). Such evidence "may consist of proof . . . that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." McKinney, 74 S.W.3d at 307. In this case, Defendant Thomas testified that he did not commit the murder of James Day. Therefore, the trial court should have provided the jury an instruction on residual doubt.

Our supreme court has concluded that a convicted defendant's right to have the jury instructed on nonstatutory mitigating circumstances is statutory rather than constitutional in nature and thus, the failure to instruct the jury on nonstatutory mitigating circumstances when raised by the evidence is subject to harmless error analysis. See State v. Hodges, 944 S.W.2d 346, 351-52 (Tenn.), cert. den. 522 U.S. 999, 118 S.Ct. 567 (1997). "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. at 352. However, if "by their breadth, the instructions on nonstatutory mitigating circumstances encompassed all the evidence presented by the defense," the omission of an instruction on a specific mitigating circumstance is harmless. Id. at 356.

Here, the trial court instructed the jury to consider "any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence." This broad instruction encompassed Defendant Thomas' denial of guilt and served to give the jury the opportunity and duty to consider any residual doubts about his culpability. Accordingly, we are confident that the trial court's failure to give a specific instruction on residual doubt had no effect on the jury's verdict, and Defendant Thomas is therefore entitled to no relief on this claim.

With regard to Defendant Thomas' regret for past acts and his family members' alleged inability to feed themselves, the trial court found that the testimony did not demonstrate regret for past acts. Rather, Defendant Thomas' mother testified that he had apologized for bringing his family down. Additionally, when asked whether Thomas had ever spoken of bringing down Faye Day's family, Ms. Barber responded, "The only thing - he told me that he was charged with this armored

---

[2] On April 29, 1997, eight days after Defendant Thomas shot Mr. Day, this statute was amended to provide that this Court "shall not set aside a sentence of death . . . on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not ennumerated in subsection (j)." Tenn. Code Ann. § 39-13-204(e)(1) (1997); see also State v. Hall, 958 S.W.2d 679, 694-95 (Tenn. 1997).

driver and that a man died from it." The trial judge concluded, "I don't even really remember any - any statements by the mother that he's shown any real regret for any past acts. . . . I didn't hear any inkling of remorse about any of those [prior aggravated robbery convictions]." Regarding the fact that his family members are unable to feed themselves, the trial court found there was no proof to support this instruction. Accordingly, these circumstances were not raised by the proof and the trial court did not err by failing to so instruct. Even assuming error, any such error was harmless given that the trial court did provide the jury with the catch-all instruction as to mitigating circumstances. It is clear that the trial court's refusal to instruct the jury as to Defendant Thomas' alleged regret for past acts and his family members' alleged inability to feed themselves did not result in an instruction that failed to fairly submit the legal issues or misled the jury as to the applicable law. Defendant Thomas is not entitled to relief on this claim.

### XIII. Improper Cross-Examination of Defendant's Mother

During the penalty phase of the trial, the State sought to cross-examine Defendant Thomas' mother, Luella Barber, regarding a disciplinary write-up he received while in jail. The trial court permitted the questioning, finding, "I think that's appropriate because that has a direct bearing on what she's testified to with regard to him being a good person or whatever. . . . I'll allow you to ask about the jail incident." The State proceeded with the following questioning of Luella Barber:

Q:     Okay. Are you aware of an incident that occurred in the jail back on June 7th of 2001 of this year?

A:     An incident –

Q:     Involving Andrew Thomas?

A:     No, I'm not.

Q:     Where he was part of a strip search that they do to the inmates, and they found a six-and-a-half-inch shank on him.

A:     I don't work here, so I don't know.

Q:     You didn't know anything about that?

A:     No one ever notified me about that[.]

Mrs. Barber testified that knowledge of this incident would not change her opinion as to her son. Defendant Thomas complains that this line of questioning was error because it was more prejudicial than probative.

Our criminal code provides that the rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding. See Tenn. Code Ann. § 39-13-204(c). See also Stout, 46 S.W.3d at 702. The supreme court has interpreted section 39-13-204(c) as permitting trial judges

wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing. See State v. Sims, 45 S.W.3d 1, 14 (Tenn.), cert. den. 534 U.S. 956, 122 S.Ct. 357 (2001). As the Sims court stated,

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

45 S.W.3d at 14. The questioning was relevant to rebut testimony about Defendant Thomas' positive character traits, including allegations by Mrs. Barber that Defendant Thomas attempted to improve himself while incarcerated. Thus, Defendant Thomas is not entitled to relief on this claim.

## XIV. Failure to Act as 13th Juror

Defendant Thomas also argues that the verdict was contrary to the weight of the evidence and the trial court, acting as thirteenth juror, should have overturned the verdicts. Tennessee Rule of Criminal Procedure 33(f) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Our supreme court has explained that "Rule 33(f) imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case . . . ." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995).

When the trial judge simply overrules a motion for new trial, this Court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. See id.

In the instant case, the trial court simply overruled the Defendant's motion for new trial without making any comments regarding a dissatisfaction with the weight of the evidence. Thus, this Court presumes that the trial court acted as thirteenth juror and approved the verdicts of the jury. Because the record contains no statements by the trial court expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or indicating that the trial court misunderstood its role as thirteenth juror, this Court will not grant the defendant a new trial on this basis. See State v. Moats, 906 S.W.2d 431, 435-36 (Tenn. 1998).

39

## XV.  Indictment Failed to Charge Capital Offense

Defendant Thomas asserts that, pursuant to <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000), the indictment against him did not charge a capital offense and that he cannot, therefore, be sentenced to more than life imprisonment. Defendant's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Essentially, Defendant Thomas complains that the indictment returned by the grand jury charges non-capital first degree murder because the grand jury did not find any capital aggravating circumstances. That is, Defendant Thomas alleges that to satisfy the requirements of <u>Apprendi</u>, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. Because of this omission in the indictment, he argues that the State was then precluded from filing a Rule 12.3 notice of intent to seek the death penalty, which provides that a notice of intent to seek the death penalty may be filed "[w]here a capital offense is charged in the indictment or presentment."  Tenn. R. Crim. P. 12.3(b).  Defendant Thomas asserts that, since a capital offense was not charged in the indictment, the State could not then rely upon aggravating factors to enhance his sentence to death.

Our supreme court has recently ruled that "the principles of <u>Apprendi</u> do not apply to Tennessee's capital sentencing procedure.  Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution."  <u>Dellinger</u>, 79 S.W.3d at 467. Thus, Defendant Thomas is not entitled to relief on this ground.

## XVI.  Tennessee's Death Penalty Scheme Violates International Treaties

Defendant Thomas next asserts that Tennessee's imposition of a death penalty violates United States treaties and hence the federal constitution's Supremacy Clause.[3]  Defendant Thomas claims that the Supremacy Clause was violated when his rights under treaties and customary international law to which the United States is bound were disregarded. Specifically, his argument is based upon two primary grounds: (1) customary international law and specific international treaties prohibit capital punishment, and (2) customary international law and specific international treaties prohibit reinstatement of the death penalty by a governmental unit once it has been abolished. This identical argument has recently been rejected by panels of this Court in <u>State v. Richard Odom</u>, No. W2000-02301-CCA-R3-DD, 2002 WL 31322532, at **32-35 (Tenn. Crim. App., Jackson, Oct. 15, 2002),  and <u>State v. Robert Faulkner</u>, No. W2001-02614-CCA-R3-DD, 2003 WL 22220341, at *31 (Tenn. Crim. App., Jackson, Sept. 26, 2003).  We see no viable reason to resolve this issue in a different manner in the present case.  Defendant Thomas is not entitled to relief on this issue.

---

[3]"This Constitution [of the United States of America], and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding."  U.S.Const. Art. 6[2.].

## XVII.  Tennessee's Death Penalty Scheme is Unconstitutional

The Defendant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions.  Included within his claim that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, and Article II, Section 2 of the Tennessee Constitution, are the following:

A.  Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants.  Specifically, the statutory aggravating circumstance set forth in Tennessee Code Annotated section 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, that they fail to provide a meaningful basis for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.

We note that factors (i)(5), (i)(6) and (i)(7) do not pertain to this case as they were not found by the jury.  Thus, any individual claim with respect to these factors is without merit.  See, e.g., Hall, 958 S.W.2d app. at 715;  State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), cert. denied, 513 U.S. 1020, 115 S. Ct. 585 (1994).  Also, this argument has been rejected by our supreme court.  See Vann, 976 S.W.2d app. at 117-118; State v. Keen, 926 S.W.2d 727, 742 (Tenn. 1994).

B. The death sentence is imposed capriciously and arbitrarily in that

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty.

This argument has been rejected.  See State v. Hines, 919 S.W.2d 573, 582 (Tenn.1995), cert.

denied,  519 U.S. 847, 117 S. Ct. 133 (1996).

(2) The death penalty is imposed in a discriminatory manner based upon race, geography, and gender.

This argument has been rejected.  See State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994),

cert. den. 513 U.S. 1086, 115 S.Ct. 743 (1995).

C.  There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter.

This argument has been rejected.  See Cazes, 875 S.W.2d at 269.

D.  The death qualification process skews the make-up of the jury and results in a relatively prosecution-prone, guilt-prone jury.

41

This argument has been rejected.  See State v. Reid, 91 S.W.3d 247 app. at 313 (Tenn. 2002), cert. den. 72 USLW 3236, 124 S.Ct. 56 (2003), and cases cited therein.

E.  Defendants are prohibited from addressing misconceptions about matters relevant to sentencing.

This argument has been rejected.  See id.

F.  Requiring the jury to agree unanimously to a life verdict violates McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227 (1990) and Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860 (1988).

This argument has been rejected.  See Reid, 91 S.W.3d app. at 313.

G.  There is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances.

This argument has been rejected.  See id.

H.  The jury is not required to make the ultimate determination that death is the appropriate penalty.

This argument has been rejected.  See id.

I.  The defendant is denied final closing argument in the penalty phase of the trial.

 This argument has been rejected.  See id.

J.  Mandatory introduction of victim impact evidence and mandatory introduction of other crime evidence upon the prosecutor's request violates separation of powers and injects arbitrariness and capriciousness into capital sentencing.

This argument has been rejected by a panel of this Court.  See State v. Robert Faulkner, No. W2001-02614-CCA-R3-DD, 2003 WL 22220341, at ** 36-37 (Tenn. Crim. App., Jackson, Sept. 26, 2003).

K.  The appellate review process in death penalty cases, including comparative proportionality review, is constitutionally inadequate.

This argument has been rejected. See Reid, 91 S.W.3d app. at 313. Moreover, our supreme court has held that, while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required. See State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997), cert. denied, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

## XVIII. Review Pursuant to Tenn. Code Ann. § 39-13-206(c)

For a reviewing court to affirm the imposition of a death sentence, our criminal code requires a determination that:

(1) the sentence was not imposed in an arbitrary fashion;
(2) the evidence supports the jury's finding of statutory aggravating circumstance(s);
(3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and
(4) the sentence is not excessive or disproportionate to the penalty imposed in similar cases.

See Tenn. Code Ann. § 39-13-206(c)(1). The sentencing phase in the present case was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure. We conclude that the sentence of death, therefore, was not imposed in an arbitrary fashion. Moreover, the evidence indisputably supports aggravating circumstance (i)(2) (Defendant Thomas was previously convicted of one or more felonies which involved the use or threat of violence to the person), and further supports the jury's determination that this aggravating circumstance outweighs any mitigating circumstances.

Additionally, this Court is required by section 39-13-206(c)(1)(D), Tennessee Code Annotated, and under the mandates of Bland, 958 S.W.2d at 661-674, to consider whether the Defendant's sentence of death is disproportionate to the penalty imposed in similar cases. See State v. Godsey, 60 S.W.3d 759, 781-82 (Tenn. 2001). The comparative proportionality review is "designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is 'disproportionate to the punishment imposed on others convicted of the same crime.'" Stout, 46 S.W.3d at 706 (quoting Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984))). "If a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed,' then the sentence is disproportionate." Stout, 46 S.W.3d at 706 (citation omitted).

In conducting our proportionality review, this Court must compare the present case with cases involving similar defendants and similar crimes. See id. We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001). We begin with the presumption that the sentence of death is proportionate with the crime of first degree murder. See Terry v. State, 46 S.W.3d 147, 163 (Tenn.), cert. den. 534 U.S. 1023, 122 S.Ct.

553 (2001), (citing Hall, 958 S.W.2d at 699). This presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" See Terry, 46 S.W.3d at 163 (citing McCleskey v. Kemp, 481 U.S. 279, 308, 107 S. Ct. 1756 (1987) (quoting Gregg v. Georgia, 428 U.S. 153, 206, 96 S. Ct. 2909 (1976))).

Applying this approach, the Court, in comparing this case to other cases in which the defendants were convicted of the same or similar crimes, looks at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. See Terry, 46 S.W.3d at 164. Regarding the circumstances of the crime itself, numerous factors are considered including: (1) the means of death, (2) the manner of death, (3) the motivation for the killing, (4) the place of death, (5) the victim's age, physical condition, and psychological condition, (6) the absence or presence of provocation, (7) the absence or presence of premeditation, (8) the absence or presence of justification, and (9) the injury to and effect on non-decedent victims. See Stout, 46 S.W.3d at 706 (citing Bland, 958 S.W.2d at 667); see also Terry, 46 S.W.3d at 164. Contemplated within the review are numerous factors regarding the defendant, including: (1) prior criminal record, (2) age, race, and gender, (3) mental, emotional, and physical condition, (4) role in the murder, (5) cooperation with authorities, (6) level of remorse, (7) knowledge of the victim's helplessness, and (8) potential for rehabilitation. See Stout, 46 S.W.3d at 706; Terry, 46 S.W.3d at 164.

In completing our review, we remain cognizant of the fact that no two cases involve identical circumstances. See generally Terry, 46 S.W.3d at 164. Moreover, we do not attempt to employ mathematical or scientific methodology. See Bland, 958 S.W.2d at 668. Thus, our function is not to limit our comparison to those cases where a death sentence is perfectly symmetrical, but rather, our objective is only to identify and to invalidate the aberrant death sentence. See Terry, 46 S.W.3d at 164 (citing Bland, 958 S.W.2d at 665).

In this case, the jury convicted the twenty-seven-year-old African-American defendant of first degree felony murder. It imposed a death sentence based on the single statutory aggravating circumstance that the defendant had a prior violent felony conviction. See Tenn. Code Ann. § 39-13-204(i)(2). The proof established that the then twenty-four-year-old Thomas shot the thirty-nine-year-old African-American victim, James Day, in the back of the head. Day, a uniformed guard for Loomis Fargo, had just picked up the deposit from the Walgreens store on Summer Avenue. As Mr. Day left the store, Defendant Thomas approached from behind, and, without demanding the money or meeting resistance from Mr. Day, placed the gun to the back of Mr. Day's head and fired. Evidence was introduced establishing that Defendant Thomas and Defendant Bond had planned the robbery the previous day. Evidence also established that immediately after the robbery and shooting, the two defendants divided their proceeds and went shopping. Each defendant purchased a new car within hours of the incident. While watching a news report of the incident, Defendant Thomas exclaimed that he "grabbed the nigger by the throat and shot him."

Defendant Thomas' criminal history includes eight prior convictions for aggravated robbery and one prior conviction for simple robbery. Defendant Thomas was released from prison less than

44

two months prior to this offense. During the penalty phase, Defendant Thomas presented evidence that his mother was abused by his father and then her second husband. His father was rarely present in his life and he had an extensive criminal record. With the exception that he was sorry for bringing down his family, there is no evidence of any remorse on the part of the Defendant for the loss of Mr. Day's life. As for a potential for rehabilitation, the Defendant did earn his GED while in prison and did find employment following his incarceration but had been released for only a short time before committing the current offense. The Defendant's family indicated a belief that the Defendant could contribute to their lives, even if incarcerated.

Considering the nature of this crime and the Defendant's character, Tennessee's appellate courts have approved the death penalty in cases that have many similarities with this case. Our supreme court has upheld the death penalty in numerous cases wherein the defendant shot the unarmed victim from close range and with no provocation. See, e.g., State v. McKinney, 74 S.W.3d 291, 299 (Tenn.), cert. den. 537 U.S. 926, 123 S.Ct. 321 (2002), (defendant shot unarmed victim in back of neck from close range); Sims, 45 S.W.3d at 19 (defendant shot unarmed victim in back of head with no provocation); State v. Henderson, 24 S.W.3d 307, 316 (Tenn.), cert. den. 531 U.S. 934, 121 S.Ct. 320 (2000), (defendant shot unarmed and unconscious deputy sheriff in head at close range); Bland, 958 S.W.2d at 670 (defendant shot unarmed victim); Stout, 46 S.W.3d at 707 (defendant shot victim in back of head with no provocation). The death sentence has been upheld based on the sole aggravating circumstance of a prior violent felony conviction, Tenn. Code Ann. § 39-13-204(i)(2). See, e.g., McKinney, 74 S.W.3d at 291 (prior conviction for aggravated robbery); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000), cert. den. 532 U.S. 925, 121 S.Ct. 1367 (2001), (prior convictions for attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175 (Tenn.), cert. den. 531 U.S. 886, 121 S.Ct. 205 (2000), (prior convictions for assault to commit voluntary manslaughter and manslaughter). The prior violent felony factor is an aggravating circumstance that our supreme court has described as "'more qualitatively persuasive and objectively reliable than others.'" McKinney, 74 S.W.3d at 313 (quoting State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993)). Finally, the death sentence has been affirmed where the defendants were of approximately the same age as Defendant Thomas. See, e.g., State v. Carter, 114 S.W.3d 895, 909 (Tenn. 2003) (defendant twenty-four years old); Smith, 993 S.W.2d at 6 (twenty-three-year-old defendant); State v. Burns, 979 S.W.2d 276 (Tenn.1998), cert. den. 527 U.S. 1039, 119 S.Ct. 2402 (1999), (twenty-three-year-old defendant shot and killed victim during robbery); State v. Cribbs, 967 S.W.2d 773 (Tenn.), cert. den. 525 U.S. 932, 119 S.Ct. 343 (1998) (twenty-three-year-old defendant shot victim once in the head).

Upon our review of the above and other cases, we conclude that this murder places Defendant Thomas in the class of defendants for whom the death penalty is an appropriate punishment and that the death sentence imposed by the jury in this case is proportionate to the penalty imposed in similar cases. In so concluding, we have considered the entire record and reach the decision that the sentence of death was not imposed arbitrarily, that the evidence supports the finding of the (i)(2) aggravator, that the evidence supports the jury's finding that the aggravating circumstance outweighs mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

**Issues Raised by Defendant Bond**
**I. Testimony of Angela Jackson**

The State called Angela Jackson as a rebuttal witness at the close of the Defendants' proof. During rebuttal, the prosecution asked Ms. Jackson whether Ms. Jackson had contacted the District Attorney's Office irate because her name had been in the newspaper due to her being a witness during this trial. The prosecution ultimately elicited testimony that Ms. Jackson was afraid of Defendant Thomas. The questioning was in response to Defendant Thomas' challenge to Ms. Jackson's motivation for testifying against Defendant Thomas. Defendant Bond complains that testimony of Ms. Jackson's frustration with her name being in the newspaper is irrelevant to establish her fear of Defendant Thomas. As the State points out, Defendant Bond failed to object to this testimony at trial. Moreover, although Defendant Thomas did express concern as to the content of the newspaper article, he also failed to object as to the relevancy of the testimony. Thus, any alleged error is waived. See Tenn. R. App. P. 36(a).

Notwithstanding waiver, there was no mention of Defendant Bond during Ms. Jackson's rebuttal testimony. The testimony was limited in scope and duration. Any assertion that the jury would attribute Ms. Jackson's fear of Thomas to Defendant Bond is unfounded in the record. The trial court did not abuse its discretion in permitting this line of questioning. Moreover, Defendant Bond has failed to establish that he was prejudiced by the admission of such testimony. Defendant Bond is not entitled to relief on this issue.

**Issues Jointly Raised by Both Defendant Thomas and Defendant Bond**
**I. Unconstitutional Selective Prosecution**

The major violators unit, MVU, was created by federal grant in the 1970s in response to a need in Shelby County to target repeat offenders. The judges of the Shelby County Criminal Court agreed that MVU cases should be handled by a specific judge in a specific courtroom. Once an offender is designated MVU by the District Attorney General, the case is automatically assigned to Division V of the Shelby County Criminal Court. This program gives the District Attorney discretion to designate any defendant with multiple felony convictions an MVU case, after which one prosecutor is designated to remain with the case through final disposition. Rather than dividing the management and responsibility for a case among numerous prosecutors as it moves through pre-trial and trial, this vertical method of prosecution avoids excessive delay and promotes the more efficient prosecution of repeat offenders. Under LEAA (Law Enforcement Assistance Agency) grants in the 1970s, one courtroom was established to handle MVU cases. One court was to handle the MVU cases for expediency and purposes of judicial economy.

Defendants Thomas and Bond raise several complaints arising from their designation as an MVU case. Specifically, Defendant Thomas asserts that, because his case was classified by the office of the District Attorney General as a major violator, multiple violator, or MVU case prior to indictment, the prosecution, in effect, directed the Shelby County Criminal Court Clerk's Office to assign this case to Division V of the Criminal Court. Accordingly, he alleges that the District Attorney engages in unconstitutional selective prosecution and is in violation of Rule 4 of the Rules of Practice and Procedure in the Criminal Courts of Shelby County. Defendant Bond claims that the trial court's failure to require assignment under Rule 4.01, Local Rules of Shelby County Criminal

Court, violated his constitutional rights. At the trial level, Defendant(s) sought relief in the form of (1) dismissal of the indictment due to unconstitutional selective prosecution, (2) recusal of the trial court due to acquiescence in the prosecution's disregard of Rule 4.01, and (3) removal of the District Attorney General for the 30th Judicial District. The trial court, in ruling on the Defendants' motions, found, in relevant part:

> I just truly believe that even taking all of the defendant's factual assertions as being completely true, that their motions are without merit, they're not well-taken, and that there's no purpose to be served by taking proof in this case. I'll accept everything they say as being true with regard to the procedures that are followed – in terms of designating cases for MVU in terms of having the grand jury funnel the MVU cases to Division V. But even with all of those facts being the case, I think the law is still very well settled that that procedure does not violate equal protection or due process in any regard.
> . . .
> But the same principle – so you don't have prosecutors running to ten or twelve different courts, prosecutors that handled [certain types of cases] can go to one or two courts. Those judges can familiarize themselves with sentencing alternatives. And it's that type of principle, I think, that has been in existence with regard to major violators since its inception in the mid to late 70s; and I think there are sound reasons for it, sound public-policy reasons, sound legal reasons; and absent any showing of specific denial of due process or equal protection, any specific prejudice resulting from the fact that these individuals are in this division of court set for trial, the process itself, I don't think, can be assailed given the case law that allows it and supports it and states that there is no constitutional deprivation with this type of system.

Local Rule 4.01, Rules of the Shelby County Criminal Court, provides:

> The following method will be employed by the Criminal Court Clerk's Office for the initial assignment of cases to the ten divisions of Court. The following types of cases will be assigned to the ten divisions of court in numerical order beginning with Division I through X as the indictments are filed in the Criminal Court Clerk's Office. This procedure shall be used in the following types of cases: Murder in the First Degree, Attempt Murder in the First Degree, Conspiracy to Commit First Degree Murder, Second Degree Murder, Aggravated Kidnapping, Especially Aggravated Robbery, Aggravated Rape, Aggravated Arson, Aggravated Robbery, Rape, Aggravated Sexual Battery, Voluntary Manslaughter, Vehicular Homicide, Kidnapping, Robbery, Spousal Rape and Incest. All other cases will be divided equally among the ten divisions of the Court. All salary petitions filed by the Criminal Court Clerk and the Sheriff will be heard by the Administrative Judge.

Rule 4.05, Rules of the Shelby County Criminal Court, provides:

The judges may transfer cases among themselves by mutual consent. It is not necessary that the parties or their counsel consent to such transfer. A party requesting a transfer of a case from one division to another division shall obtain an order from the Court to which the case is assigned, transferring the case to another division.

Defendants contend that the MVU classification violates Rule 4.01. We conclude otherwise. Rule 4.05 specifically permits judges of the Shelby County Criminal Court to transfer cases among themselves by mutual consent. It appears from the findings of the trial court that the judges of Shelby County by mutual consent have had in place a system for more than twenty years in which MVU defendants would be tried in one particular division of the court. There is no right, constitutional or otherwise, bestowed upon a criminal defendant by Rule 4.01. Indeed, a defendant does not have the right to have his case heard by a particular judge, see Sinito v. United States, 750 F.2d 512, 515 (6th Cir. 1984), neither does he have the right to any particular procedure for the selection of a hearing judge, see Cruz v. Abbate, 812 F.2d 571, 574 (9th Cir. 1987), nor does he enjoy the right to have a judge selected by a random draw, see Sinito, 750 F.2d at 515. Rather, the rule appears to be an administrative rule created to ensure an even distribution of cases among the various divisions of the Shelby County Criminal Court.

Practical realities dictate the allocation of limited public resources. Accordingly, "our courts must afford public officials substantial discretion with regard to law enforcement decisions." State v. Harton, 108 S.W.3d 253, 261 (Tenn. Crim. App. 2002) (citing Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663 (1978)). We recognize, however, that the classification of a defendant as a major violator and the subsequent assignment of MVU cases to one division of court implicates issues of selective prosecution and due process on the judicial assignment phase of adjudication.

The Due Process Clause imposes strict neutrality requirements on officials performing judicial or quasi-judicial functions. See Schweiker v. McClure, 456 U.S. 188, 195, 102 S. Ct. 1665 (1982). Those requirements are not applicable to those acting in a prosecutorial or plaintiff-like capacity. See Marshall v. Jerrico, Inc., 446 U.S. 238, 248, 100 S. Ct. 1610 (1980). "In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law." Id. When prosecutorial rather than judicial functions are involved, the constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated. See id.

In light of the role that prosecutors play as advocates, at least two state courts have concluded that judicial assignment systems allowing prosecutors to select the judge assigned to a particular case violate due process. In State v. Simpson, 551 So.2d 1303 (La. 1989) (per curiam), the defendant filed an application for a supervisory writ seeking reassignment of his case to another judge. Noting that the prosecutor and the defense attorney had stipulated that in the Louisiana district at issue, the prosecution was allowed to select the judge who presided over criminal cases, the Louisiana Supreme Court granted the writ. The court reasoned:

> To meet due process requirements, capital and other felony cases must be allotted for trial to the various divisions of the court, or to judges assigned criminal court duty, on a random or rotating basis or under some other procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned.

Id. at 1304 (footnotes omitted). The Simpson court based this conclusion on the concept that "[d]ue process of law requires fundamental fairness, i.e., a fair trial in a fair tribunal." Id. (citing Turner v. Louisiana, 379 U.S. 466, 85 S. Ct. 546, 13 L.Ed.2d 424 (1965); State v. Mejia, 250 La. 518, 197 So.2d 73 (1967)). The court noted decisions from other jurisdictions concluding that courts may utilize different methods of assigning criminal cases to judges, but observed that these decisions do not stand for the proposition that the prosecutor may assign cases to the judge of his or her choice. Id. at 1304 n.3.

In an earlier decision, a New York state court took a similar approach. In McDonald v. Goldstein, 191 Misc. 863, 83 N.Y.S.2d 620 (N.Y. Sup. Ct. 1948), the court rejected a district attorney's challenge to an order divesting his office of its long-accepted authority to select judges for criminal cases. See id. at 622 (noting that "[t]he District Attorney for some time past has selected the judge in each case by moving indictments for trial directly to the several parts of the court."). The court based its ruling on general principles of judicial independence, noting that judges should be free from outside control, especially by any of the litigants. See id. at 625 ("It is the people's prerogative, not the District Attorney's to say who will preside over the County Court of Kings County.").

In contrast to Simpson and McDonald, most federal courts that have addressed the issue of prosecutorial involvement in judicial assignments have not found due process violations. In Tyson v. Trigg, 50 F.3d 436, 439-42 (7th Cir. 1995), cert. den. 516 U.S. 1041, 116 S.Ct. 697 (1996), (Tyson II), the most recent and thorough of these federal decisions, the Seventh Circuit rejected an argument raised in a habeas corpus proceeding that the case assignment system in an Indiana state court violated the defendant's due process rights. The system in question allowed the prosecutor to select one of six grand juries to which a proposed indictment would be presented. Each grand jury was assigned to a specific judge, and thus, by selecting the grand jury, prosecutors implicitly chose the judge to which the case would be assigned. The habeas petitioner in Tyson II did not argue that the assigned judge was prejudiced against him. Instead, he asserted that to allow the prosecutor to pick the judge so greatly stacks the deck against the defendant as to make the trial unfair -- so unfair as to deny due process of law. Id. at 439.

The Seventh Circuit rejected that argument.[4] First, it noted a lack of precedent holding that prosecutorial steering could constitute a due process violation warranting the reversal of a

---

[4]The Seventh Circuit did note, however, that '[t]he practice of allowing the prosecutor to choose the grand jury and hence the trial judge is certainly unsightly" and "lack[s] the appearance of impartiality." 50 F.3d at 442.

conviction. Additionally, it concluded that the fact that the prosecutor might gain a certain advantage over the defendant in being allowed to select the judge did not render the trial fundamentally unfair. See id. at 440-41. It reasoned that the American system of criminal procedure is not balanced equally between the prosecution and the defense at every stage, but rather represents an aggregate of imbalances. Id. at 440. Thus, prosecutors have certain advantages in the investigative stage and in impeaching witnesses, while the rules on burdens of proof favor defendants. See id. Absent any allegation that the judge selected by the prosecutor was actually biased against the defendant, the imbalance caused by the Indiana system was not so egregious as to affect the fairness of the trial.

Several other federal courts have held that, in order to establish a due process violation for prosecutorial judge-shopping, a defendant must demonstrate actual prejudice by the assignment of a particular judge to his case. For example, in United States v. Gallo, 763 F.2d 1504, 1532 (6th Cir. 1985), cert. den. 474 U.S. 1068, 106 S.Ct 826 (1986), the Sixth Circuit rejected the defendant's argument that he was entitled to a new trial because the prosecutors had engaged in a pattern of steering significant criminal cases to the judges of their choice. See id. The court relied on its earlier decision in Sinito v. United States, supra, in which it had held that due process concerns were not implicated by a clerical error resulting in the assignment of a case to a different judge than would have sat absent the error. See Gallo, 763 F.2d at 1532. The Sinito panel had concluded that "a defendant does not have the right to have his case heard by a particular judge," does not "have the right to have his judge selected by a random draw," and "is not denied due process [when the selection process is not operated in compliance with local rules] . . . unless he can point to some resulting prejudice." Sinito, 750 F.2d at 515. The Gallo panel found this reasoning dispositive, rejecting the defendant's argument because he had not alleged that the trial judge was in any way disqualified to hear his case. 763 F.2d at 1532. Several other decisions have similarly required a showing of prejudice. See, e.g., United States v. Erwin, 155 F.3d 818, 825 (6th Cir. 1998), cert. den. 525 U.S. 1123, 119 S.Ct. 906 (1999); United States v. Osum, 943 F.2d 1394, 1401 (5th Cir. 1991).

Although all of these decisions offer helpful and relevant analysis, they differ from the instant case. First, we hesitate to conclude that the designation of a criminal defendant as a major violator by the District Attorney General and his Assistants constitutes judge-shopping. Once a defendant is determined to qualify as a major violator, the District Attorney does not select what division to which the case will be assigned. Rather, it appears that the judges of the Shelby County Criminal Court specifically designated Division V to hear such cases. Notwithstanding, even if we were to consider this process judge-shopping, we are also cognizant that the judge assigned to MVU cases has been sworn to uphold the law and defend the Constitution, and his or her conduct can be scrutinized through appellate review. We presume honesty and integrity in those acting as adjudicators. See Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456 (1975). Thus, we refuse to presume that the judge assigned to MVU designees acts as an agent of the prosecutor. Additionally, it does not appear to this Court that the designation of Division V as the MVU court necessarily results in a court in which the determination of guilt or innocence cannot reliably be made.

50

Finally, Defendants have failed to establish that they were prejudiced by the assignment of their case to Division V. Accordingly, we cannot conclude that the Defendants were deprived of a fair trial by assignment to Division V nor do we conclude that by assigning MVU defendants to Division V, the Shelby County Courts are in violation of Local Rule 4.01. This issue is without merit.[5]

## II. Propriety of State's Argument to Jury

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. See Terry, 46 S.W.3d at 156. However, closing argument must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried. See Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). The State is more limited in its prerogative due to the prosecutor's role as a seeker of justice, rather than a mere advocate. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995), overruled on other grounds, State v. West, 19 S.W.3d 753 (Tenn. 2000). "Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." Id. Prosecutorial misconduct during argument does not constitute reversible error unless it appears that the outcome was affected to the defendant's prejudice. See State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001).

Both Defendants contend that the prosecutor's opening statement and closing arguments were so marred by misconduct as to require a new trial. We note first, however, that Defendant Thomas and Defendant Bond's failure to object to opening and closing argument at trial waives our consideration of this issue on appeal. See Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Thus, where a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute "plain error." See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). In determining whether an alleged trial error constitutes "plain error," we consider five factors: 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the defendant must have been adversely affected; 4) the defendant did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice." See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642.

---

[5]In his reply brief, Defendant Thomas makes vague references to his equal protection rights having been violated upon his case's MVU designation. He cites us to no cases in support of this proposition, however. Accordingly, this "issue" is waived. See Tenn. Ct. Crim. App. R. 10(b).

## A. Greed and Evil

The prosecutor for the State who made opening statement in this case began, "You can't hide from greed and evil. James Day learned that lesson on April 21st, 1997 . . . ." She continued: "James Day learned you can't hide from greed and evil," and "He walked into the path of greed and evil." Throughout opening statement, the prosecutor referred collectively to Defendant Thomas and Defendant Bond as "greed and evil." This theme was repeated during closing argument, in which both prosecutors made references that "James Day couldn't hide from greed and evil," "there was no hiding from or escaping the circle of greed and evil," and "greed and evil really didn't care that day whether he lived or died." The prosecutors referred to the Defendants as "greed and evil" a total of twenty-one times during the opening statement and closing arguments of the guilt phase of the trial. Defendant Thomas and Defendant Bond, neither of whom entered a contemporaneous objection to these statements, ask this Court to find plain error in the State's conduct. See Tenn. R. Crim. P. 52(b).

It is improper for the prosecutor to use epithets to characterize a defendant. The prosecutors' repeated references to Defendant Thomas and Defendant Bond as "greed and evil" was improper. See, e.g., Cauthern, 967 S.W.2d at 737 (evil one); State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (rabid dog); State v. Ladonte Montez Smith, No. M1997-00087-CCA-R3-CD, 1999 WL 1210813, at *12 (Tenn. Crim. App., Nashville, Dec. 17, 1999) (guilty dog); State v. Joel Guilds, No. 01C01-9804-CC-00182, 1999 WL 333368, at *5 (Tenn. Crim. App., Nashville, May 27, 1999) (this clown). When a prosecutor engages in improper argument, we must also consider the curative measures taken by the court and/or the prosecution; the prosecutor's intent in making the improper remarks; the cumulative effect of the erroneous statements and any other errors in the record; and the relative strength or weakness of the case. See Bigbee, 885 S.W.2d at 809; State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

Here, we find the prosecutors' comments unseemly but harmless in the context of the entire argument. No curative instruction was provided primarily because neither Defendant Thomas nor Defendant Bond objected to the characterization. Moreover, the State's case was strong and the effect of the error was insignificant. In short, the State's improper argument did not undermine the fundamental fairness of the trial, and we therefore conclude that this issue gains the Defendants no relief.

## B. Don't Give Defendants a Freebie

During opening statement of the penalty phase, counsel for Defendant Thomas stated, "[Defendant] Thomas will never get out of jail. He'll be in there, at the earliest, until he's eighty." In response to this statement, the prosecutor began her closing argument with,

> I'm going to start off this morning by apologizing . . . for wasting your time
> this week because you heard it, they're both doing a lot of time already. "Why in the

world are we down here?  Let's just forget this murder.  I'm sorry, Ms. Day, James Day's death should be a freebie.  I mean, they're already doing a lot of time."

Defendants contend that it was improper to argue that a defendant should be sentenced to death as additional punishment for a previous conviction.  The State contends that this was a proper response to Defendant Thomas' attempt to minimize the current crime by emphasizing the penalties he already faced.

While community conscience arguments are generally improper, a prosecutor's closing argument must be evaluated in light of the defense argument that preceded it.  See Darden v. Wainwright, 477 U.S. 168, 179, 106 S. Ct. 2464, 2470 (1986).  Here, both Defendants ignore that it was defense counsel who first invoked community conscience by telling the jurors that Defendant Thomas had already been sentenced to a lengthy period of confinement.  Obviously the prosecutor's comment was a response to that statement.

In Darden, supra, the Supreme Court considered the following factors in determining that the prosecutors' closing argument did not deprive the defendant of a fair trial:

> The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. Much of the objectionable content was invited by or was responsive to the opening summation of the defense.  . . . [T]he idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," reduced the likelihood that the jury's decision was influenced by argument. . . . "Darden's trial was not perfect--few are--but neither was it fundamentally unfair."

Id. at 181-83 (citations omitted).  Similar factors are present here. Doubtless the testimony of the numerous witnesses and the admission by Defendant Bond did far more to seal their fate than a single abbreviated comment by the prosecutor during closing argument. As in Darden, the trial may not have been perfect, but it was fair and no reversible error can be predicated on the prosecutor's closing argument.

### III. Admission of Expert Testimony

Defendant Thomas complains that the trial court committed several errors with regard to the admission of expert testimony.  Specifically, Defendant Thomas complains (1) Dr. Gardner should not have been permitted to testify and make comments regarding the victim's therapy, (2) Dr. Smith

should not have been permitted to provide opinions as to the treatment of the victim immediately after the shooting, (3) Dr. Smith should not have been qualified as a ballistics expert, and (4) Dr. Smith should not have been permitted to testify about events in the hospital immediately after the victim was shot. Defendant Bond joins Defendant Thomas' complaints regarding (1) Dr. Smith's testimony regarding the diagnosis and treatment of the victim as a living patient and (2) Dr. Smith being qualified as an expert in ballistics.

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, provided the scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue. See Tenn. R. Evid. 702. An expert may base his or her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing; the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts. See Tenn. R. Evid. 703. If the underlying facts or data lack trustworthiness, the court shall disallow expert testimony based upon them. See id. Evidence and expert testimony regarding scientific theory must be both relevant and reliable before it may be admitted. See McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). The trial court has broad discretion in resolving questions concerning the qualifications, admissibility, relevance, and competency of expert testimony. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). An appellate court should not overturn a trial court's decision in admitting or excluding a proposed expert's testimony unless it finds the trial court abused its discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

A. Dr. Cynthia Gardner

Defendant Thomas complains that Dr. Gardner's testimony concerning the victim's therapy should not have been allowed as it was outside her field of expertise. During Dr. Gardner's direct testimony, she was questioned as to the daily regimen of care for James Day by his wife. An objection was made on the basis that Dr. Gardner is "not a health-care provider, she's not a physical therapist, she's not — doesn't have any expertise in any of these areas." The trial court sustained the objection, and instructed the prosecutor to rephrase the line of questioning. No other objections were made to this line of questioning. The State submits that Defendant Thomas has, therefore, waived any challenge to Dr. Gardner's testimony on this issue.

Dr. Gardner is a licensed medical doctor in Tennessee and is currently employed as an assistant medical examiner for Shelby County. Dr. Gardner is also an instructor in pathology for the medical school. Dr. Gardner completed her residency in anatomic and clinical pathology following medical school, then completed a fellowship in forensic pathology. Based upon her training as a medical doctor, Dr. Gardner was qualified to testify regarding catheterization. The trial court did not abuse its discretion in admitting this testimony. This claim is without merit.

## B. Dr. Smith

Defendant Thomas claims that "the trial court further erred by allowing Dr. O. C. Smith to give opinions in several areas of medicine of which he was not an expert [,] [i]including, but not limited to, giving his opinion as to whether treatment was proper after the victim was shot." To the extent that Defendant Thomas fails to delineate specific grounds of error, those claims are waived. See Tenn R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b). Specifically, Defendants Thomas and Bond assert two challenges to Dr. Smith's testimony: (1) Dr. Smith is not qualified to render opinions as to a living person, and (2) Dr. Smith should not have been qualified as an expert in ballistics.

### (1) Living person

Dr. Smith was asked to render an opinion as to the cause of death of the victim and whether it related to the gunshot fired by Defendant Thomas two and one-half years earlier. Determining the cause of death is the type of opinion a medical examiner is called upon to make. Dr. Smith's review of the treatment records, including assessments of James Day's injuries, was necessary to the formation of that opinion. In this regard, Dr. Smith is a licensed medical doctor in the State of Tennessee and board certified in forensic pathology, anatomical pathology, and clinical pathology. Based upon his training as a medical doctor, Dr. Smith was qualified to testify regarding the gunshot wound inflicted upon the victim, the likely results of such an injury, and the course of treatment to the victim. The trial court did not abuse its discretion in admitting this testimony. This claim is without merit.

### (2) Ballistics expert

During voir dire of Dr. Smith, Dr. Smith stated that he has previously testified as a ballistics expert. Defendant Bond objected, stating that the testimony of a ballistics expert was not relevant to the victim's cause of death. The objection was overruled. The trial court determined that a ballistics expert could "shed some light on the gunshot wound," recognizing that "the state is attempting . . . to demonstrate that the gunshot is the cause – the initial event that caused his death; and to that end, I think if this witness can be qualified as a ballistics expert, his opinion may be very helpful in shedding some light on the facts of the case[.]" Dr. Smith then continued to explain the role of a ballistics expert and the training necessary to become a forensic firearms examiner. He stated that he received training in forensic firearms examination by R.A. Stindler. Objection was again made by both Defendant Bond and Defendant Thomas, on the basis that such testimony was not relevant. On appeal, Defendants complain that the qualifications of Dr. Smith as a ballistics expert were irrelevant in that no knowledge of firearms identification and analysis was introduced with his opinion as to the cause and manner of death.

Defendants are correct that there was no direct challenge to the fact that the victim was wounded by a bullet. However, the effect of the shot was crucial to the defense and the State had the burden of proving beyond a reasonable doubt that the victim's death was the result of a gunshot wound inflicted during the robbery. Dr. Smith's training in forensic firearm identification,

55

specifically his military training involving traumatic injuries, permitted him to make the determination as to whether the shot was likely to be fatal. We cannot conclude that the trial court abused its discretion in permitting Dr. Smith to be qualified as a firearms expert. This claim is without merit.

## IV. Lesser-included Offenses of Felony Murder

At the close of proof, Defendant Bond asked that the jury be instructed as to the lesser-included offenses of first degree murder, those being second degree murder, reckless homicide, and criminally negligent homicide. Defendant Bond also asked for an instruction on facilitation of a robbery.[6] Defendant Thomas requested instructions on second degree murder and the appropriate lesser-included offenses of murder or homicide. The trial court denied all requests for instructions on lesser-included offenses of first degree felony murder. In denying the requests, the trial court found that, "factually, . . . this case [is not] appropriate for the charging of any lesser offenses." Specifically, the court noted the existence of a videotape of the robbery/murder, revealing "an individual steps out from behind the building, behind Mr. Day, puts a gun to the back of his head and, in essence, executes him even though his final demise is two and a half years later." The trial court noted that "there's nothing shaky about this shooting," "[t]here's no confronting Mr. Day face on," there is no evidence that "the gun misfire[d] or the gun [went] off accidentally." On appeal, both Defendants challenge the trial court's ruling.

The right to jury instructions on lesser-included offenses is based, in large measure, upon the constitutional right to trial by jury. See Tenn. Const. art. I, § 6; State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. See State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). "The standard of review for mixed questions of law and fact is de novo with no presumption of correctness." Id. The trial court has a duty to give a complete charge of the law applicable to the facts of a case. See State v. Harbison, 704 S.W.2d, 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. In addition, the trial court has a statutory duty to instruct the jury on all applicable lesser-included offenses. See Tenn. Code Ann. § 40-18-110.[7]

In State v. Burns, our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser-included offense:

An offense is a lesser-included offense if:
(a) all of its statutory elements are included within the statutory elements of the

---

[6]Because Defendant Bond was not charged with a robbery offense in this case, this request was unfounded.

[7]Since the trial in this matter, the legislature has amended section 40-18-110 to provide that for all trials conducted on or after January 1, 2002, the failure of the defendant to request, in writing, an instruction on any lesser-included offense shall constitute a waiver of that instruction. See Tenn. Code Ann. § 40-18-110(c) (Repl. 2003).

offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

   (1) a different mental state indicating a lesser kind of culpability; and/or

   (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

   (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

   (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

   (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d 453, 466-67 (Tenn. 1999). Utilizing this analysis, our supreme court has determined that second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the Burns test. See Ely, 48 S.W.3d at 721-22. Additionally, under part (c) of the Burns test, facilitation of felony murder is a lesser-included offense of felony murder. See id. at 720. Our supreme court has acknowledged that facilitation "is not an immediately lesser offense of felony murder . . . [but] is a separate and distinct theory of liability from that of a principal offender or someone who is criminally responsible for the conduct of another." State v. Locke, 90 S.W.3d 663, 672 (Tenn. 2002).

The trial court has a duty to instruct the jury as to a lesser-included offense if: (1) any evidence exists that reasonable minds could accept as to the lesser-included offense, and (2) the evidence is legally sufficient to support a conviction of the lesser-included offense. See Burns, 6 S.W.3d at 469. This duty applies whether or not a defendant requests such an instruction. See State v. Rush, 50 S.W.3d 424, 428 (Tenn. 2001); but see Tenn. Code Ann. § 40-18-110(c) (Repl. 2003). Moreover, our supreme court has held that trial courts must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. See State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002). The evidence, not the parties, controls whether an instruction is required. See id. at 188. Our high court observed that the jury is not required to believe any evidence offered by the State, and held that the authority of the jury to convict on a lesser-included offense may not be taken away, even when proof supporting the element distinguishing the greater offense from the lesser offense is uncontroverted. See id. at 189.

### A. Defendant Thomas

We turn now to whether the evidence supported a jury instruction on any of the lesser-included offenses of felony murder with respect to Defendant Thomas. Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A defendant kills another person knowingly when he engages in conduct that he is aware is reasonably certain to cause death. See id. § 39-11-302(b). Deliberately shooting someone in the back of the head satisfies the definition of

knowing conduct. In this case, a surveillance videotape from a store security camera showed Defendant Thomas approach the armored car guard from behind, shoot him in the back of the head, take the money bag, and flee without making any demand for money or engaging in any kind of struggle. James Day survived the initial shooting, but was paralyzed as a result thereof and required constant care from his wife, including regular catheterization due to the neurogenic bladder resulting from the gunshot. Both Dr. Smith and Dr. Gardner testified that the sepsis causing the victim's death was a direct result of the gunshot wound inflicted by Defendant Thomas on April 21, 1997. This evidence supported an instruction on second degree murder as to Defendant Thomas.

The "next" lesser-included offense of felony murder is reckless homicide, which is the "reckless killing of another." Id. § 39-13-215(a). A reckless killing is committed when the defendant engages in conduct which he is aware creates a substantial and unjustifiable risk of death to the victim, but consciously disregards that risk. See id. § 39-11-302(c). Deliberately shooting someone in the back of the head from close range certainly creates a substantial and unjustifiable risk of death, and the jury was therefore also entitled to an instruction on reckless homicide as to Defendant Thomas. Similarly, the evidence justified an instruction on negligent homicide, which requires that the defendant engaged in criminally negligent conduct resulting in death of the victim. See id. § 39-13-212(a). Criminal negligence occurs when the defendant engages in conduct that creates a substantial and unjustifiable risk that the victim will be killed, but fails to perceive the risk.[8] Again, the evidence in this case supported an instruction on this lesser-included offense as to Defendant Thomas. Accordingly, the trial court erred in refusing to charge the jury on these lesser-included offenses of felony murder.

Facilitation of felony murder is a lesser-included offense under part (c) of the Burns test. An instruction on facilitation of felony murder is required where the proof demonstrates that (1) a killing was committed in the perpetration of one of the felonies enumerated in the statute defining felony murder, (2) the defendant knew that another person intended to commit the underlying felony, but he did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense, (3) the defendant furnished substantial assistance to that person in the commission of the felony, and (4) the defendant furnished such assistance knowingly. See Ely, 48 S.W.3d at 719-20. The proof in this case demonstrated that Defendant Thomas approached the victim from behind, shot him in the back of the head, grabbed the money carried by the victim, and ran to the getaway car. Thomas' theory of defense was twofold: (1) he was not involved in the robbery and (2) an intervening factor, and not the gunshot wound, was the cause of the victim's death. Thomas did not defend on the ground that he simply facilitated someone else in committing this crime. Moreover, there is no proof in the record to support a jury instruction on facilitation of felony murder with respect to Thomas. Accordingly, the trial court committed no error in refusing to charge the jury on this lesser-included offense.

---

[8]"The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-11-302(d)

We must now determine whether the trial court's failure to instruct the jury on the lesser-included offenses of second degree murder, reckless homicide and criminally negligent homicide was reversible error as to Defendant Thomas. In State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court held that the erroneous failure to instruct on lesser-included offenses may be harmless under certain circumstances. The supreme court re-examined the standard to be applied when assessing whether a trial court's failure to provide lesser-included offense instructions constituted harmless error in Ely, 48 S.W.3d at 710. In Ely, our supreme court held that "when determining whether an erroneous failure to instruct on a lesser-included offense requires reversal, . . . the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt." Id. at 727. In conducting this inquiry, "the reviewing court must determine whether a reasonable jury would have convicted the defendant of the lesser-included offense instead of the charged offense." Richmond, 90 S.W.3d at 662. That is, "the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser-included offense did not affect the outcome of the trial." Id. "In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Allen, 69 S.W.3d at 191.

In the present case, the proof overwhelmingly established Defendant Thomas' participation in the robbery of James Day and his sharing in the proceeds thereof. The proof overwhelmingly established that Defendant Thomas employed a firearm to execute the robbery. It is uncontested that during the robbery, James Day was shot in the back of the head with the weapon. The victim, James Day, died over two years after the incident as a result of sepsis caused by the need for catheterization due to a neurogenic bladder which was the result of the gunshot. Defendant Thomas defended on two grounds: (1) he was not involved in the robbery at all and (2) an intervening factor, and not the gunshot wound, was the cause of the victim's death. Under the "it wasn't me" theory, the Defendant was guilty of no offense and the charging of lesser-included offenses would have had no impact on the verdict. Likewise, under the theory of the intervening factor causing James Day's death, no homicide whatsoever occurred. The jury found and the evidence overwhelmingly supports its finding that Defendant Thomas is guilty of first degree murder committed during the perpetration of a robbery. James Day was robbed and shot and he ultimately died as a result of that incident. Although lesser offenses as to other forms of homicide exist and, if found, can be supported by the evidence, the jury in this case would not have reasonably concluded that anything less than a murder in the perpetration of a robbery occurred. We therefore conclude that the trial court's failure to instruct on the lesser included offenses did not affect the outcome of the trial. Thus, any error as to the instructions on second degree murder, criminally negligent homicide, and reckless homicide is harmless beyond a reasonable doubt and Defendant Thomas is entitled to no relief on this ground.

## B. Defendant Bond

We turn now to the issue of lesser-included offenses with respect to Defendant Bond. There is no proof in the record before us that Bond shot and killed James Day. Rather, the State adduced proof that Bond was an active participant in the underlying felony of robbery, driving the getaway

car and splitting the stolen money with Thomas. Nevertheless, Bond may be held criminally liable for the victim's death to the same extent as Thomas under the theory of criminal responsibility for the conduct of another. See Tenn. Code Ann. § 39-11-402(2) (A defendant is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense). Thus, because the proof supported jury instructions on second degree murder, reckless homicide and criminally negligent homicide with respect to Defendant Thomas, the same instructions should have been issued with respect to Bond. In refusing to give these instructions, the trial court erred. Nevertheless, for the same reasons that we find the error harmless beyond a reasonable doubt as to Thomas, we find the error harmless beyond a reasonable doubt as to Bond.[9]

Our next inquiry is whether the trial court should have instructed the jury that Defendant Bond facilitated the felony murder of James Day. As set forth above, an instruction on facilitation is required where the proof demonstrates that (1) a killing was committed in the perpetration of one of the felonies enumerated in the statute defining felony murder, (2) the defendant knew that another person intended to commit the underlying felony, but he did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense, (3) the defendant furnished substantial assistance to that person in the commission of the felony, and (4) the defendant furnished such assistance knowingly. See Ely, 48 S.W.3d at 719-20. The proof at trial regarding Bond's participation in the robbery consisted of the following:

(1) his fingerprint was found on the getaway car;

(2) an eyewitness identified him as the driver of the getaway car;

(3) he carried the envelopes containing money from the robbery into Angela Jackson's home;

(4) he left Jackson's home with the gun;

(5) he remarked during a television show that he had robbed an armored truck;

(6) he admitted his involvement in the robbery to law enforcement officers; and

(7) he pled guilty to federal charges arising from the robbery.

This proof is certainly sufficient to sustain Defendant Bond's conviction of the felony murder of James Day. However, with respect to determining whether an instruction on facilitation of felony murder was warranted, we must view this evidence "liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Burns, 6 S.W.3d at 469. Moreover, our supreme court has instructed us that "the jury is free to reject any evidence offered by the State, no matter how uncontroverted or uncontested a particular fact or element may appear." Richmond, 90 S.W.3d at 660. So long as there is evidence

---

[9]Like Defendant Thomas, Defendant Bond defended on the basis that an intervening factor, and not the gunshot wound, caused the victim's death. Bond did not defend on the ground that he was not involved in the crime at all.

sufficient such that a jury <u>could</u> convict on that lesser-included offense, no matter how improbable, the lesser-included offense must be charged to the jury. <u>See</u> <u>id.</u> at 662.

Keeping these principles in mind, we conclude that the proof warranted a facilitation instruction as to Bond. Bond took no active part whatsoever in the attack upon James Day. Bond was not armed during the robbery and was not even present at the actual crime scene. Rather, his participation was limited to assisting Thomas depart from the crime scene. This evidence <u>could</u> have justified a jury in concluding that Bond knew that Thomas intended to commit the robbery, drove Thomas away from the scene out of a warped sense of fellowship rather than out of an intent to actively assist Thomas in his criminal activity, and did not form the intent to share in the proceeds of the robbery until <u>after</u> the crime had been completed. Certainly, had the jury been given an instruction on facilitation of felony murder as to Bond, and returned with a guilty verdict as to that charge, this Court would uphold the conviction on a challenge to the sufficiency of the proof. Given that the evidence supported a jury instruction on facilitation of felony murder as to Bond, we find that the trial court erred in refusing to provide one.

Our remaining inquiry is whether this error was harmless beyond a reasonable doubt; that is, whether a reasonable jury <u>would</u> have convicted Defendant Bond of the lesser-included offense of facilitation of felony murder instead of the charged offense of felony murder. <u>See</u> <u>Richmond</u>, 90 S.W.3d at 662. Bond's guilt of felony murder was predicated <u>solely</u> upon his criminal responsibility for the actions of Thomas. Significantly in this case, the jury was given only two choices: convict Bond of felony murder just like Thomas or find him not guilty of any crime at all. Given the proof before it, no reasonable jury was going to simply acquit Bond and set him free. However, although the jury convicted both Defendant Thomas and Defendant Bond of felony murder, the jury chose to impose the death penalty only on Thomas. The jury sentenced Defendant Bond to life without the possibility of parole. Clearly, since the two Defendants have very similar backgrounds and very similar criminal histories, the jury determined that Bond was less culpable in James Day's murder than was Thomas. The jury's verdicts at the guilt and sentencing phases of this trial, combined with the erroneously limited alternatives given to it, precludes us from concluding beyond a reasonable doubt that, had the jury also been instructed on facilitation of felony murder, it would have eschewed this lesser-included offense and convicted Defendant Bond of felony murder. Stated differently, we cannot conclude beyond a reasonable doubt that the jury, if given the opportunity, would not have convicted Bond of facilitation of felony murder. <u>See</u> <u>Allen</u>, 69 S.W.3d at 191. "Because we are unable to conclude beyond a reasonable doubt that the omission of an instruction [on facilitation] did not affect the outcome of the trial, we must hold that the error was not harmless." <u>Id.</u> at 191-92. Accordingly, we must reverse Defendant Bond's conviction of felony murder and remand this matter for a new trial on this charge.

61

## Conclusion

### Defendant Thomas

Having fully reviewed the record, the briefs and the applicable authority, we affirm Defendant Thomas' conviction for first degree felony murder. Additionally, in accordance with the mandate of Tennessee Code Annotated section 39-13-206(c)(1), and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find, with regard to Defendant Thomas, that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstance, and the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. Furthermore, our comparative proportionality review, considering both the nature of the crime and the defendant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. See id. § 39-13-206(c)(1)(D). Accordingly, we also affirm the sentence of death imposed on Defendant Thomas.


### Defendant Bond

We have determined that the trial court's failure to properly charge the jury as to the lesser-included offense of facilitation of felony murder was not harmless beyond a reasonable doubt with respect to Defendant Bond. Therefore, Defendant Bond is entitled to a new trial. Accordingly, Defendant Bond's conviction for the murder of James Day is vacated and this matter is remanded for a new trial on the charge of first degree felony murder in the death of James Day.


_____
DAVID H. WELLES, JUDGE